936 F.2d 1448
 30 Wage & Hour Cas. (BN 657, 60 USLW 2069,
119 Lab.Cas. P 56,699
 GENERAL ELECTRIC COMPANY, Plaintiff-Appellant,
v.
NEW YORK STATE DEPARTMENT OF LABOR; Thomas F. Hartnett,
Industrial Commissioner of the State of New York; Charles
Drobner, Director of Public Work, New York State Department
of Labor; Robert Abrams, Attorney General of the State of
New York, Defendants-Appellees.
 No. 692, Docket 90-7672.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 18, 1991.
Decided June 28, 1991.
 
 James S. Frank, New York City (Virgil B. Day, Marc S. Wenger, Neil A. Capobianco, Vedder, Price, Kaufman, Kammholz & Day, of counsel), for plaintiff-appellant.
 M. Patricia Smith, Asst. Atty. Gen., New York City (Jane Lauer Barker, Asst. Atty. Gen. In Charge Labor Bureau, Robert Abrams, Atty. Gen., State of N.Y., of counsel), for defendants-appellees.
 Before OAKES*, Chief Judge, and CARDAMONE and MAHONEY, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 This appeal challenges the validity of New York Labor Law Sec. 220 (McKinney 1990). Appellant General Electric Company (GE) claims that the statute violates the due process clause of the Fourteenth Amendment, both on its face and as applied in this case because it unconstitutionally delegates authority to private parties to set prevailing wage rates. It also claims Sec. 220 is unconstitutionally vague and is preempted by the National Labor Relations Act, 29 U.S.C. Sec. 151, et seq. Finally, GE argues that Sec. 220's provisions relating to wage supplements--which we have previously held are preempted by Sec. 514(a) of the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. Sec. 1144(a), see General Electric Co. v. New York State Dep't of Labor, 891 F.2d 25 (2d Cir.1989)--are non-severable.
 
 
 2
 For the reasons stated below, we reverse and remand with respect to GE's due process claim for further discovery and a trial on the merits, if necessary. In all other respects, we affirm.
 
 BACKGROUND
 A. New York Labor Law Sec. 220
 
 3
 New York's Labor Law Sec. 220(3) requires that workers employed by a contractor or person doing work in connection with any contract to which the state is a party shall be paid not less than the prevailing rate of wages and wage supplements paid to workers in the private sector who perform similar work in the same locality.
 
 
 4
 The prevailing wage rate, as amended on July 15, 1983, is fixed "by virtue of collective bargaining agreements between bona fide labor organizations and employers of the private sector, performing public or private work provided that said employers employ at least thirty per centum of workers, laborers or mechanics in the same trade or occupation in the locality where the work is being performed." Sec. 220(5)(a). "Supplements" or fringe benefits include "all remuneration for employment paid in any medium other than cash, or reimbursement for expenses, or any payments which are not 'wages' within the meaning of the law," Sec. 220(5)(b), and are determined in the same manner as are wages, by collective bargaining agreements under Sec. 220(5)(c). Wages and wage supplements wrongfully withheld by an employer must be repaid and the law provides for civil and criminal penalties. Labor Law Sec. 220(7), (9).
 
 
 5
 The "locality" or geographic area used to fix the prevailing wage rate and supplements is defined by reference to the scope of the same "current collective bargaining agreements between bona fide labor organizations and employers of the private sector, performing public and private work." Sec. 220(5)(d).
 
 B. Facts
 
 6
 Because the instant litigation has been before us once before and has been the subject of two district court opinions, we set forth only those facts necessary to our discussion. In January 1987 GE entered into a contract with the Long Island Railroad (Railroad) to service and repair electric transformers located in Kings, Queens, Nassau, and Suffolk counties in New York. Performance of the contract was undertaken by General Electric Apparatus and Engineering Services--New York Service Center, a sub-entity of GE. The Service Center is headquartered in North Bergen, New Jersey, but the work at issue was performed in New York State. The Service Center's employees are represented by Local 3, International Brotherhood of Electrical Workers (IBEW, Local 3 or union), and collective bargaining agreements between Local 3 and GE were in force during the relevant period.
 
 
 7
 In 1987 the New York State Department of Labor (Department) commenced an investigation into the wages and supplements GE paid its employees working on the Railroad project, and determined preliminarily that they had been underpaid, including penalty and interest, by $676,118. The Department determined the applicable prevailing wage and supplement rates for work done in Kings and Queens Counties through rates set in the collective bargaining agreement between Local 3 and an electrical contractors association, and for the work done in Nassau and Suffolk counties through rates set in the collective bargaining agreement between Local 25, IBEW and an electrical contractors association. These agreements provide for the payment of wages and supplements that are different from, and in some cases more than, those provided by GE to its employees working on the Railroad contract. Both agreements have two different wage scales, accompanied by explicit statements that the lower wages--which in both cases establish wages approximately one-half the higher wage scale--are not applicable to public works projects. In calculating GE's delinquency, the Department relied on the higher of the two wage scales to set in the four named counties the prevailing wages. At the Department's request, the Railroad withheld $439,294 in contract payments from GE.
 
 C. Procedural History
 
 8
 On July 22, 1988 GE commenced the instant action seeking declaratory and injunctive relief against enforcement of Labor Law Sec. 220 and for recovery of the withheld funds. It alleged that the statute's prevailing wage provisions, as applied to its contract with the Railroad, are preempted by ERISA and by the National Labor Relations Act, 29 U.S.C. Sec. 151, et seq., (NLRA), and that the statute is an unconstitutional delegation of legislative power to private parties in violation of the Due Process Clause of the Fourteenth Amendment. GE also raised two state law claims.
 
 
 9
 On September 29, 1988 the United States District Court for the Southern District of New York (Carter, J.) denied GE's motion for a preliminary injunction, holding that Labor Law Sec. 220 was not preempted by the NLRA, ERISA or other federal statutes. It did not reach the due process claim. On November 29, 1989 we vacated the district court's order on the ground that ERISA does preempt the portion of Labor Law Sec. 220 dealing with supplements. General Electric Co. v. New York State Dep't of Labor, 891 F.2d at 30. The district court's holding that the state statute is not preempted by the NLRA was affirmed because, as a minimum labor standard, the statute does not interfere with the collective bargaining process. Id. at 27-28. We remanded the due process claim for initial consideration by the district court.
 
 
 10
 Upon remand, GE conducted discovery on its constitutional claim. On February 1, 1990 the district court denied GE's motion for further discovery and instead ordered the parties to submit cross-motions for summary judgment. On March 2, 1990 the parties stipulated that the Department would permit the release of all money withheld by the Railroad from GE in return for GE's posting a bond payable in accordance with a final order of the district court, after exhaustion of all appeals and collateral proceedings.
 
 
 11
 On June 7, 1990 the district court granted summary judgment dismissing GE's due process challenge to Labor Law Sec. 220, stating that "[t]o the extent, if any, that the federal constitution limits the states' delegation of 'governmental' decisions to self-interested third parties, these limitations are certainly respected by Section 220." 742 F.Supp. 80. The district court reaffirmed its prior holding that Labor Law Sec. 220 is not preempted by the NLRA, and also decided that our prior opinion "was not intended to preempt the non-ERISA elements of the supplement provisions," and that the portions of the statute held by us to be preempted by ERISA were severable from the rest of the statute. The district court's decision to sever the offending portion was based on its conclusion "that the framers of Section 220 would have preferred severance to the greater inequality that would result from wholesale invalidation of the supplement provisions." On July 13, 1990 the district court entered judgment in accordance with its opinion. From that judgment GE appeals.
 
 DISCUSSION
 
 12
 Because summary judgment was granted dismissing GE's due process claim, we examine the standard of review. In determining whether summary judgment was properly granted, the same standard is applied on appeal as that used by the district court under Federal Rule of Civil Procedure 56(c). See Burtnieks v. City of New York, 716 F.2d 982, 985 (2d Cir.1983). Under Rule 56(c) the moving party has the burden of showing the absence of any genuine issue of material fact, see Adickes v. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). A fact is material when its resolution would "affect the outcome of the suit under the governing law," and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).
 
 
 13
 We view the evidence in the light most favorable to the party opposing the motion, see United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam), taking as true any factual allegations in that party's pleadings, if they are supported by affidavits or other evidentiary material. See First National Bank of Cincinnati v. Pepper, 454 F.2d 626, 629 (2d Cir.1972). Here the parties have filed statements pursuant to Local Rule 3(g) which provides that any facts that the moving party sets forth as undisputed in its statement, and that the nonmoving party fails to controvert, must also be deemed admissions and taken as true. Of course, under the Rule the moving party must support its motion by depositions, affidavits based on personal knowledge, and admissions.
 
 
 14
 Further, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). GE, as the plaintiff against whom summary judgment was granted, must "do more than simply show that there is some metaphysical doubt as to the material facts" if the facts themselves fail to support a legally sufficient cause of action in order to reverse the result defendants obtained in the district court. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). Appellant may not rest upon conclusory allegations or denials, but must set forth specific facts and circumstances supported by depositions, affidavits based on personal knowledge, and admissions. See S.E.C. v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir.1978).I GE'S DUE PROCESS CLAIM
 
 
 15
 With these standards in mind, we turn to GE's due process argument. GE contends that by expressly delegating authority to private parties to set prevailing wage and supplement rates (with which GE must comply)--without providing adequate safeguards to prevent the collusive setting of rates in the collective bargaining agreements relied upon--Labor Law Sec. 220 is constitutionally invalid on its face. It asserts alternatively, that the statute is unconstitutional as applied in this case because while the statutory language may allow the Department to make an independent determination of prevailing wage and supplement rates--notwithstanding attempts to collusively negotiate artificially enhanced rates--in fact the New York State Department of Labor simply adopts without inquiry whatever the unions in the locality represent to be the prevailing wage and supplement rates. In that way, GE concludes, private parties set these rates de facto.
 
 A. GE's Property Interest
 
 16
 Before discussing the facial and as applied arguments, we set forth the analytical framework for that discussion. Governmental action may be challenged as a violation of due process only when it may be shown that it deprives a litigant of a property or a liberty interest. See Board of Regents of State Colleges v. Roth, 408 U.S. 564, 571-72, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972); Eastway Constr. Corp. v. City of New York, 762 F.2d 243, 249-50 (2d Cir.1985), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). GE must meet this constitutional threshold to successfully raise a due process claim.
 
 
 17
 The existence and dimensions of property interests are defined by "existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Goetz v. Windsor Central School Dist., 698 F.2d 606, 608 (2d Cir.1983) (quoting Board of Regents v. Roth, 408 U.S. at 577, 92 S.Ct. at 2709). Once created a property interest cannot be taken except pursuant to constitutionally adequate procedures. See Atkins v. Parker, 472 U.S. 115, 128, 105 S.Ct. 2520, 2528, 86 L.Ed.2d 81 (1985).
 
 
 18
 It is well established that a contractor has a right to timely payment for work it performs under a contract with a state agency, and that such right is a property interest protected by the due process clause. See Signet Constr. Corp. v. Borg, 775 F.2d 486, 489 (2d Cir.1985); Oberlander v. Perales, 740 F.2d 116, 120 (2d Cir.1984). Here GE's property interest is implicit in Sec. 220 itself, which both creates an entitlement to payment of the full contract price, except if a contractor fails to pay the determined prevailing rates, Sec. 220(8), and provides for a hearing to determine if cause exists to deprive a contractor of the full contract price. See Sec. 220-b. Thus, state law supports GE's claim of entitlement.
 
 
 19
 Eastway Constr. Corp., 762 F.2d 243, and the other cases relied on by the state are not to the contrary. In Eastway, the plaintiff, a construction contractor, was denied the right to participate in city construction contracts and brought suit alleging this deprivation violated its civil rights. We held that the abstract need or desire to participate in public construction contracts did not constitute a property right protected by the Fourteenth Amendment. Id. at 250. There are two distinctions between the plaintiff in Eastway and GE here. First, unlike the plaintiff in Eastway, GE has already performed the work under its contract and the state is withholding not the abstract right to participate in the publicly-financed projects, but the right to payment for work already performed. Second, while the Eastway plaintiff "fail[ed] to point to a single constitutional, statutory or contractual provision that would entitle it to [participate in publicly-financed projects]," id., GE can point to its entitlement under both its contract and Sec. 220 of New York's Labor Law as support for its claimed property interest.
 
 
 20
 Further, it is conceded that the money at stake was withheld from GE by the Railroad at the state's request and that GE risks losing these funds because it remains obligated under its bond held by the district court, subject to termination of this litigation. It therefore has a cognizable property interest of which the state may not deprive it without affording adequate procedures. Having concluded that GE has a property interest, we need not address whether it also has a liberty interest in avoiding the criminal penalties threatened for failure to pay the prevailing wage rate. Instead we turn to the viability of its cause of action for an alleged unconstitutional delegation.
 
 B. Unconstitutional Delegation Doctrine
 
 21
 "At least since Yick Wo v. Hopkins, 118 U.S. 356 [6 S.Ct. 1064, 30 L.Ed. 220] (1886)," the Supreme Court teaching is that the due process clause "places limits on the manner and extent to which a state legislature may delegate to others powers which the legislature might admittedly exercise itself." McGautha v. California, 402 U.S. 183, 272 n. 22, 91 S.Ct. 1454, 1473 n. 22, 28 L.Ed.2d 711 (1971) (Brennan, J., dissenting). See, e.g., Eubank v. City of Richmond, 226 U.S. 137, 33 S.Ct. 76, 57 L.Ed. 156 (1912) (setting of property line by adjacent owners); Embree v. Kansas City & Liberty Blvd. Road Dist., 240 U.S. 242, 36 S.Ct. 317, 60 L.Ed. 624 (1916) (determination of boundary for road district by petition of landowners); Browning v. Hooper, 269 U.S. 396, 46 S.Ct. 141, 70 L.Ed. 330 (1926) (same as Embree ); Cline v. Frink Dairy Co., 274 U.S. 445, 47 S.Ct. 681, 71 L.Ed. 1146 (1927) (finding of anti-trust violation by jury); Seattle Title Trust Co. v. Roberge, 278 U.S. 116, 49 S.Ct. 50, 73 L.Ed. 210 (1928) (zoning variance only by consent of adjacent owners); Louisiana v. United States, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965) (power to decide voting rights by state officials); Giaccio v. Pennsylvania, 382 U.S. 399, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966) (assessment of costs against criminal defendant by jury); Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (decision to replevy goods made by private parties); Mitchell v. W.T. Grant Co., 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974) (writ of sequestration granted upon application of vendor); cf. Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936) (Fifth Amendment due process clause limits ability of federal government to delegate to other coal producers the power to fix wages and hours).
 
 
 22
 In Eubank, the Supreme Court struck down a Richmond ordinance that required the city's Building Committee to establish set-back lines for a given piece of property whenever requested to do so by two-thirds of the adjacent property owners. The Court ruled that this ordinance violated due process, stating:
 
 
 23
 One set of owners determine not only the extent of use but the kind of use which another set of owners may make of their property.... The statute and ordinance, while conferring the power on some property holders to virtually control and dispose of the proper rights of others, creates no standard by which the power thus given is to be exercised; in other words, the property holders who desire and have the authority to establish the line may do so solely for their own interest and even capriciously.
 
 
 24
 226 U.S. at 143-44, 33 S.Ct. at 77. In Roberge, a Seattle zoning ordinance allowed a home for the aged poor to be built in a particular area, but only "when the written consent shall have been obtained of the owners of two-thirds of the property within four hundred (400) feet of the proposed building." 278 U.S. at 118, 49 S.Ct. at 50-51. Again, the Supreme Court struck down the ordinance:
 
 
 25
 The [ordinance] purports to give the owners of less than one-half the land within 400 feet of the proposed building authority--uncontrolled by any standard or rule prescribed by legislative action--to prevent the trustee from using its land for the proposed home. The superintendent is bound by the decision or inaction of such owners. There is no provision for review under the ordinance; their failure to give consent is final. They are not bound by any official duty, but are free to withhold consent for selfish reasons or arbitrarily and may subject the trustee to their will or caprice. [citation omitted]. The delegation of power so attempted is repugnant to the due process clause of the Fourteenth Amendment.
 
 
 26
 Id. at 121-22, 49 S.Ct. at 52.
 
 
 27
 Eubank and Roberge remain good law today. See City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 437 n. 5, 105 S.Ct. 3249, 3253 n. 5, 87 L.Ed.2d 313 (1985); New Motor Vehicle Bd. v. Orrin W. Fox Co., 439 U.S. 96, 126 n. 30, 99 S.Ct. 403, 420 n. 30, 58 L.Ed.2d 361 (1978) (Stevens, J., dissenting); Eastlake v. Forest City Enter., Inc., 426 U.S. 668, 677-78, 96 S.Ct. 2358, 3363-64, 49 L.Ed.2d 132 (1976); Village of Belle Terre v. Boraas, 416 U.S. 1, 6-7, 94 S.Ct. 1536, 1539-40, 39 L.Ed.2d 797 (1974); see also Geo-Tech Reclamation Indus., Inc. v. Hamrick, 886 F.2d 662, 665-66 (4th Cir.1989); Silverman v. Barry, 727 F.2d 1121, 1126 (D.C.Cir.1984) ("Given the opportunity [in Eastlake ] to overrule the Lochner-era cases of Eubank and Roberge, the court chose instead to distinguish them.").
 
 
 28
 These opinions still stand for the proposition that a legislative body may not constitutionally delegate to private parties the power to determine the nature of rights to property in which other individuals have a property interest, without supplying standards to guide the private parties' discretion. Otherwise, "administrative decision-making [will be] made potentially subservient to selfish or arbitrary motivations or the whims of local taste." Geo-Tech, 886 F.2d at 666 (citing Eubank and Roberge ).
 
 
 29
 New York's authority to set prevailing wage or hour restrictions on public works projects is not at issue. Attacks against such authority have been rejected by the Supreme Court as to both state law, see Atkin v. Kansas, 191 U.S. 207, 222-23, 24 S.Ct. 124, 127, 48 L.Ed. 148 (1903) ("it belongs to the State, as the guardian and trustee for its people, and having control of its affairs, to prescribe the conditions upon which it will permit public work to be done on its behalf, or on behalf of its municipalities"), and federal law, see Perkins v. Lukens Steel Co., 310 U.S. 113, 127, 60 S.Ct. 869, 876, 84 L.Ed. 1108 (1940) ("the Government enjoys the unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases"). Rather, the argument is that the manner chosen by the state to set the prevailing wage and supplement rates violates due process. Neither Atkin nor Perkins foreclose this claim since neither purported to address what, if any, constitutional limits constrain the manner in which the state may set such rates.
 
 
 30
 Nor is this a case where a state statute makes a general determination affecting the property rights of an individual, but provides a mechanism through which private parties--for whose benefit the statute was passed--may alter that general determination by taking some specifically enumerated action, such as protesting the application of the statute in an individual case. See New Motor Vehicle Bd. of Cal., 439 U.S. at 102, 108-09, 99 S.Ct. at 408, 411 (no unconstitutional delegation where California Automobile Franchise Act--passed to "protect[ ] the equities of existing dealers by prohibiting automobile manufacturers from adding dealerships to the market areas of its existing franchisees"--requires the California New Motor Vehicle Board to delay franchise establishments and relocations only when protested by existing franchisees); Thomas Cusack Co. v. City of Chicago, 242 U.S. 526, 531, 37 S.Ct. 190, 192, 61 L.Ed. 472 (1917) (no unconstitutional delegation where "ordinance ... absolutely prohibits the erection of any billboards in the blocks designated, but permits this prohibition to be modified with the consent of the persons who are most affected by such modification"). Here GE insists the determination of wage and supplement rates is delegated in the first instance to private parties who are not those persons the statute is designed to protect, and that the statute gives the state no option other than to accept the decision made by those private parties. Thus, New Motor Vehicle Board and Cusack are inapposite.1. Facial Challenge
 
 
 31
 We analyze in light of the recited law GE's first contention that the statute is unconstitutional on its face. A facial challenge to a legislative act "is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [a]ct would be valid." United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). The fact that a statute might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since the Court has not recognized an "overbreadth" doctrine outside the limited context of the First Amendment. Id.
 
 
 32
 Two grounds are presented for invalidating the statute on its face. The first one points to the fact that the statute mandates that the Department of Labor rely on privately-negotiated collective bargaining agreements without retaining discretion to reject unreasonable rates. As a corollary this may, GE believes, lead the Department to accept as prevailing rates negotiated through collusive means that bear no relation to actual wage rates prevailing in a given locality.
 
 
 33
 The state disputes the contention that it retains no discretion. It responds that the statute simply allows the Labor Commissioner to use collective bargaining agreements as a means of determining the prevailing wage rate, providing such agreements cover at least 30 percent of the workers in a particular trade. It interprets the statute to require that the prevailing wage rate be the actual rate paid for similar work in a locality. Therefore, it does not take whatever rates are submitted and is free to reject those rates artificially increased or decreased due to language in the collective bargaining agreement that bars the application of the more favorable lower rate to public works projects. We agree with the state. Fairly read, the statute does allow it this discretion.
 
 
 34
 The statute requires that the " 'prevailing rate of wage,' for the intents and purposes of this article, shall be the rate of wage paid in the locality ... by virtue of collective bargaining agreements between bona fide labor organizations and employers of the private sector, performing public or private work...." N.Y.Lab.Law Sec. 220(5)(a) (emphasis added). This was not always the case. Prior to the 1983 amendment, the State Department of Labor conducted surveys of the workers in each county to determine which wage and supplement rates actually prevailed. The fact that the statute now requires prevailing wage rates be set "by virtue of collective bargaining agreements," does not in our view compel the state to accept unquestionably whatever rates are furnished it. The language of the statute is broad enough to allow the state to examine the collective bargaining agreements involved and independently to decide for itself which of the rates is the true prevailing rate, that is, "the rate actually paid for similar work in a locality." Hence, GE's first facial attack based on alleged lack of discretion must fail.
 
 
 35
 The second facial attack on the statute is more theoretical, and at the same time more basic. It is urged that by forcing the state to rely exclusively on collective bargaining agreements--instead of, for example, conducting surveys as was the pre-1983 practice--the statute invariably results in an unconstitutional delegation of power. In other words, GE argues that the problems it claims occurred here--associated with reliance on allegedly collusively-bargained rates--"are endemic to the statute itself (the foreseeable result of unions pursuing their self-interest without adequate countervailing safeguards)." The state counters that the statute must be upheld even if it does in fact delegate legislative power in a manner that implicates a protected property interest because the delegation contains sufficient safeguards to avoid the proscription of Eubank and Roberge.
 
 
 36
 The district court agreed with the state. It believed that Sec. 220 limited New York's delegation of governmental decisions, and concluded that "the opportunity for one-sided self-interest or arbitrariness by private parties is greatly reduced." The key to the district court's decision on this point is its assumption that the collective bargaining process does in fact greatly reduce the opportunity for self-interest or arbitrariness by private parties to dominate the wage setting scheme. We think this assumption potentially unsound, particularly given the record in this case, where the parties are aware that the prevailing wage law mandates reliance on whatever agreement they negotiate.
 
 
 37
 We turn to that record. The Preamble to the Collective Bargaining Agreement between the New York Electrical Contractors Association and Local Union No. 3--the agreement used to set prevailing wage rates for Kings and Queens counties--states that the "highly competitive" nature of the electrical contractors has caused the parties to recognize "that on certain types of work it is necessary for the members of the Union to agree to a secondary rate of pay," and that "[t]he employers agree not to take advantage of this situation...." (emphasis added).
 
 
 38
 Article III, Rule 3, sets forth the rates of pay per hour for "A" work (subsection (f)) and "M" work (subsection (h)) as follows:
 
 
 39
 A Work M Work
June '86'87 $23.50 $12.20
June '87'88 $24.75 $12.90
June '88'89 $26.00 $13.50
 
 
 40
 Article III, Rule 4(d)(1) then states that " 'M' rated work," defined as "jobbing, maintenance, repair work ... shall not apply to public works jobs."
 
 
 41
 GE asserts that the Collective Bargaining Agreement between Local 25, IBEW and an electrical contractors union--the agreement used to set prevailing wage rates for Nassau and Suffolk counties--has a similar two-tier wage rate system. The generally applicable wage rates set forth in the agreement are roughly comparable to the "A" rates set forth above in the Local 3 agreement. A "Small Work Agreement," contained within the Local 25 agreement, allows employers to pay wages below these rates provided the work performed falls within the "scope of work" described in the Small Work Agreement. Explicitly excluded from the scope "is any facility of any size categorized as public works or for use as a public purpose."
 
 
 42
 Taken together, these portions of the Local 3 and Local 25 agreements call into question the district court's conclusion that the adversary nature of the collective bargaining process has, as a practical matter, served to curb the arbitrary self-interest of the parties who negotiated them. What seems to have occurred is that the unions and the local electrical contractors association negotiated their agreements fully aware of the impact their contracts would have on the prevailing wage applied to public works projects in the locality, and that those wage rates were then manipulated to the mutual advantage of both the unions and the employers.
 
 
 43
 Taking the facts alleged by appellant as true, the two "adversary" parties set a relatively low rate for electrical work done in the private sector in order (from the union's perspective) to make employment of union workers more attractive to employers, and (from the employers' perspective) to achieve lower labor costs for private sector employers. A higher wage rate for public work projects was agreed to in order (from the union's perspective) to make up some of the wages lost on the private sector work, and (from the employers' perspective) to give the unions higher wages without the employers incurring greater labor costs since the higher wages would be passed on to the taxpayers.
 
 
 44
 If this is in fact what occurred--and we express no view as to whether it did or did not--then neither side was forced to curb its self-interest, and the rates set in the agreement are potentially arbitrary because they reflect not the wage rates of an adversarial marketplace, but the wage rates in a setting skewed by the bargaining parties' knowing use of their agreement to achieve selfish ends. It would be difficult to measure how distorted the resulting rates are because the rates depend on subjective factors such as the amount of public versus private sector work each party, at the time they were negotiating, thought would be contracted for during the term of the agreement; but this perversion could be endemic to the system as GE asserts. In fact, the false light could be such that for the state to use only these privately-negotiated agreements would make it literally impossible for it fairly to set prevailing wage and supplement rates. It is this potential--that a system which relies solely on such privately-negotiated agreements will consistently fail to produce non-arbitrary wage and supplement rates--that makes GE's facial attack on the statute viable.
 
 
 45
 We think whether the provisions of these two collective bargaining agreements were collusively negotiated, and whether collusive negotiation, if it actually exists, is unavoidable given the statute's exclusive reliance on privately negotiated collective bargaining agreements, present questions of fact that preclude summary judgment. On remand, GE should be entitled to thorough discovery on these issues and it should be permitted to attempt a showing that Labor Law Sec. 220 is unconstitutional on its face because it delegates legislative power to private parties without sufficient standards to guide them.
 
 2. "As Applied" Challenge
 
 46
 A challenge is also made to the constitutionality of Labor Law Sec. 220 as it is applied by New York. GE insists--even assuming the statute vests the Department with the authority to reject those provisions in collective bargaining agreements that restrict the use of preferable rates to private sector work projects--that in fact the Department does not exercise its discretion. Its failure to do so constitutes, according to GE, an unconstitutional delegation of legislative authority. We agree.
 
 
 47
 Appellant asserts that Local 3 and Local 25 have negotiated public work wages just about double the normal rate for maintenance and repair work. Its version of the facts, detailed earlier, supports this claim, though the state vigorously disputes the conclusions GE draws from these facts. GE further asserts that when collecting information to set state standards, no state official reviews the negotiated rates or evaluates their fairness. Documents submitted to the district court, it declares, show that prevailing wage schedules were taken without modification from the Local 3 and Local 25 Agreements, and that this pro forma adoption of the unions' submission was in accord with the Department's unpublished internal policies. The Department's Plan of Operation sets this policy forth as follows:
 
 
 48
 Wage rate and wage supplement information is provided via a signed copy of a collective bargaining agreement and abridged materials attested to and furnished by an authorized representative of a bona fide labor organization on the "Certificate of Hourly Wages and Fringe Benefits" (PW-17).
 
 
 49
 This collected information is reviewed for each general job classification and type, effective dates of the rate, along with the territorial jurisdiction covered by the specific collective bargaining agreement. The data will be transcribed onto the "Wage and Supplement Information Report" (PW-14) for further processing via computer related functions by the Albany Central Office.
 
 
 50
 Arguably, this policy statement supports GE's position because it reveals no requirement that the accuracy of wage and supplement information provided by the unions be investigated by the Department. The State's procedure for implementing the Plan lends further support to GE's contention that no investigation of the truth or reasonableness of the rates is made when a union submits the form PW-17 described above. The procedures instruct the Senior Public Work Wage Investigator collecting wage information only to
 
 
 51
 review the information paying particular attention to the data on the PW-17, i.e., union's geographical jurisdiction and the authorizing signature of the union officer and the effective dates of the wage and supplement rates. If there is any missing information, contact labor organization.
 
 
 52
 Thus, the Department's procedures seem not to involve the exercise of any discretion in setting prevailing wage and supplement rates. The state's insistence that it does not merely take whatever rates the unions submit, but sets the prevailing rate at that actually paid in the locality may well be the case, but we must take as true for purposes of this appeal GE's allegations regarding the actual procedure followed by the state.
 
 
 53
 This disputed fact is material because both collective bargaining agreements from which the rates were drawn explicitly provide for two wage rates, and bar application of the lower wage rate to public work projects. If this two wage rate system was collusively negotiated, and simply adopted pro forma by the state (without exercising any discretion) as the resulting wage rates, this would clearly establish an unconstitutional delegation of authority under the statute as applied. Moreover, although the state attacks the sufficiency of GE's proof on this point, the record shows the state opposed GE in its attempts to procure further discovery regarding the actual procedures used by the state in setting prevailing wages.
 
 
 54
 The state's procedure in adopting these wage rates is at the heart of GE's due process claim, and is a disputed question of material fact. The district court therefore erred in granting summary judgment on the claim that New York Labor Law Sec. 220 is unconstitutional as applied. On remand, appellant should be entitled to further discovery into the actual procedure the state followed in setting the prevailing wage rate, both in this case and others and, if necessary, a trial on the merits.
 
 II VAGUENESS AND PREEMPTION CHALLENGES
 
 55
 A further claim is that Sec. 220 is unconstitutionally vague because "locality" is defined only by reference to the various collective bargaining agreements. The statute provides:
 
 
 56
 "Locality" means such areas of the state described and defined for a trade or occupation in the current collective bargaining agreements between bona fide labor organizations and employers of the private sector, performing public and private work.
 
 
 57
 N.Y.Lab.Law Sec. 220(5)(d). By defining the locality by reference to the collective bargaining agreements, appellant believes the statute does not give employers who may be subject to civil and criminal penalties sufficient notice of the potential consequences of their actions. It also claims it was not told of the "locality" applicable to the Railroad project until after it bid on it. The district court rejected GE's vagueness challenge.
 
 
 58
 The law requires that the locality determinations be made before contractors bid, N.Y.Lab.Law Sec. 220(3), so under the law all contractors are given advance notice of the wage rates. The provision is thus "clear enough to afford one a reasonable opportunity to know what is permitted and what is proscribed." Textile Workers Pension Fund v. Standard Dye & Finishing Co., 725 F.2d 843, 855 (2d Cir.), cert. denied, 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 856 (1984); see also Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498-99, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982) (less stringent vagueness standard applicable in the context of economic regulation); Toy Mfrs. of America, Inc. v. Consumer Product Safety Comm'n., 630 F.2d 70, 78 (2d Cir.1980) (incomplete notice not void for vagueness where affected party could consult with Commission for clarification).
 
 
 59
 Even if it is true that the locality notice was issued after GE bid in this case--an assertion belied by the notice in the record dated in advance of the bid date--it does not establish a constitutional violation because the law itself provides for advance notice, so that any violation of that requirement in this case might provide a state law cause of action, but would not present a federal constitutional question. Thus, the vagueness challenge to the statute fails.
 
 
 60
 The assertion that Sec. 220 is preempted by the National Labor Relations Act, 29 U.S.C. Secs. 151-169, was initially rejected by the district court and we affirmed that portion of the district court's decision on appeal. See General Electric v. Dep't of Labor, 891 F.2d at 27-28. On remand, the district court declined to revisit the preemption issue because appellant presented no new information that would justify such a revisitation. GE declares it submitted additional information that was overlooked by the trial court and that supplies the proof necessary to show preemption. We remain unpersuaded and affirm the district court on this point for substantially the same reasons stated in our previous opinion.
 
 
 61
 We further ruled in our prior decision that the supplements provisions of the statute are preempted by ERISA because they prescribe "the type and amount of an employer's contributions to [an ERISA] plan, ... the rules and regulations under which the plan operates, ... [and] the nature and amount of the benefits provided thereunder." See 891 F.2d at 29. Neither party contests this ruling on this appeal. In view of the lack of any new information bearing on the issue brought to light since that opinion, we decline to reconsider the issue of ERISA preemption, and address the scope of that holding only in the context of the severability issue.
 
 
 62
 III SEVERABILITY OF PROVISIONS PREEMPTED BY ERISA
 
 
 63
 There remains to be decided whether our prior holding that ERISA preempts Labor Law Sec. 220's supplements provisions (as applied in this case) renders the remaining portions of the statute invalid as well, or whether the supplements provisions are severable from the rest of the statute. The district court held that the supplements provisions are severable, and further differentiated between supplements provided through ERISA plans--which it held are preempted--and those provided through non-ERISA plans--which it held are not preempted by ERISA. GE argues the district court erred by not invalidating the entire statute or, in the alternative, the entirety of the supplements provisions. We think the district court correctly decided the severability issue.
 
 
 64
 The severability of a state statute is to be determined according to state law. See Doyle v. Suffolk County, 786 F.2d 523, 526-27 (2d Cir.), cert. denied, 479 U.S. 825, 107 S.Ct. 98, 93 L.Ed.2d 49 (1986). When portions of a New York statute are found unconstitutional, the intent of the state legislature in originally enacting the statute is the touchstone in determining whether the remainder of the statute is severable and may be spared from the unconstitutional taint. See People ex rel. Alpha Portland Cement Co. v. Knapp, 230 N.Y. 48, 60, 129 N.E. 202 (1920), cert. denied, 256 U.S. 702, 41 S.Ct. 624, 65 L.Ed. 1179 (1921); N.Y. Statutes Sec. 150(d) (McKinney 1991). As formulated by then Judge Cardozo, the Alpha rule holds:
 
 
 65
 The principle of division is not a principle of form. It is a principle of function. The question is in every case whether the legislature, if partial invalidity had been foreseen, would have wished the statute to be enforced with the valid part exscinded, or rejected altogether. The answer must be reached pragmatically, by the exercise of good sense and sound judgment, by considering how the statutory rule will function if the knife is laid to the branch instead of at the roots.
 
 
 66
 230 N.Y. at 60, 129 N.E. 202. As we stated in Doyle the "legislative policy should be given effect unless application of the portion of a statute remaining after partial invalidation yields results that the legislature seems unlikely to have wanted or if the remaining portion is such a minor fragment of a comprehensive provision as to make it likely that the legislature would prefer either no provision or the opportunity to craft a new one." 786 F.2d at 527.
 
 
 67
 The first step therefore is to examine the statute and its legislative history. See Westinghouse Elec. Corp. v. Tully, 63 N.Y.2d 191, 196, 481 N.Y.S.2d 55, 470 N.E.2d 853 (1984). Labor Law Sec. 220 implements Article I, Sec. 17 of the New York Constitution which provides:
 
 
 68
 No laborer, workman or mechanic, in the employ of a contractor or subcontractor engaged in the performance of any public work, shall ... be paid less than the rate of wages prevailing in the same trade or occupation in the locality within the state where such public work is to be situated, erected or used.
 
 
 69
 The New York Court of Appeals has stated that Article I, Sec. 17's purpose is "the protection of workingmen against being induced, or obliged, to accept wages below the prevailing rate from a public employer." Bucci v. Village of Port Chester, 22 NY2d 195, 201, 292 N.Y.S.2d 393, 239 N.E.2d 335 (1968); see Fata v. S.A. Healy Co., 289 N.Y. 401, 405, 46 N.E.2d 339 (1943); Austin v. City of New York, 258 N.Y. 113, 116-17, 179 N.E. 313 (1932).
 
 
 70
 Because the statute as originally passed made no reference to fringe benefits, bidders on public works contracts who provided no benefits were in a position to underbid those who did. General Elec. v. Dep't of Labor, 891 F.2d at 28. Accordingly, Sec. 220 was amended in 1956 "to require that all bidders on public works contracts assume the cost of prevailing fringe benefits in the locality, thus presumably putting all bidders on an even footing." Id.; see Action Elec. Contractors Co. v. Goldin, 64 N.Y.2d 213, 221-22, 485 N.Y.S.2d 241, 474 N.E.2d 601 (1984).
 
 
 71
 The prevailing wage law will certainly be less effective in equalizing competition in the absence of those portions of the statute's supplements provisions that are held preempted by ERISA. Yet, as the district court correctly held, the remaining portions of Sec. 220 "will continue to promote the goal of maintaining adequate wages on public works projects, and to a lesser extent, of equalizing competition for such projects" (emphasis in original). As this was the original and guiding purpose of Sec. 220, and the statute was enacted and enforced for some time without the supplements provisions, we believe the legislature would have preferred a mere pruning of the offending supplements provisions to a rooting out of the entire statute.
 
 
 72
 More difficult is the question whether it is possible to sever the non-ERISA from the ERISA supplement provisions of the statute. The district court held that the supplement provisions were valid to the extent they applied to GE's non-ERISA benefits such as, for example, vacation and holiday pay, even though such benefits could have been included in an ERISA plan. The effect of this division is curious. Contractors providing some or all of the prevailing benefits through an ERISA plan will not be required to pay anything more, while contractors not providing these benefits through an ERISA plan will be forced to pay the full prevailing rate of benefits set by reference to collective bargaining agreements in the locality. In the district court's view, though the central goal of the amended supplement provisions--to equalize competition among employers--would be "somewhat hindered" by invalidation of the ERISA portions, such a result was preferable to a wholesale invalidation of the supplement provisions.
 
 
 73
 GE aptly points out that forcing employers that have not included vacation and holiday pay in their ERISA plans to pay the prevailing wage rate will not equalize bargaining with those employers who cover such benefits in an ERISA plan. But the supplements amendment was added to an already existing statute--as discussed above--for the purpose of protecting employees who work on public works projects from being paid less than the prevailing wage rate. Forcing employers without ERISA plans to pay the prevailing rate for these supplements will mean employees in public works contracts will be paid more overall than they would be if we were to invalidate the entirety of the supplements provisions. Hence it is less likely that they will be paid below the prevailing rate, which is the primary evil the statute sought to remedy. In this respect the general purpose of Sec. 220 would be served. It seems plain therefore that the state legislature would have preferred severance of the non-ERISA supplements provisions to the invalidation of all supplements provisions.
 
 CONCLUSION
 
 74
 Accordingly, insofar as the judgment appealed from granted summary judgment dismissing appellant's claim that New York Labor Law Sec. 220 violates the Fourteenth Amendment to the United States Constitution, both on its face and as applied, it is reversed, and the matter is remanded for further discovery and, if necessary, a trial on the merits. In all other respects the judgment of the district court is affirmed.
 
 
 
 *
 Chief Judge Oakes, presided over the oral argument of this appeal, but has subsequently recused himself from considering or voting on its disposition. Pursuant to this court's Rule Sec. 0.14(b), the appeal is being decided by Judges Cardamone and Mahoney