UNITED STATES of America and The State Of New York, Plaintiffs,

v.

CITY OF NEW YORK and New York City Department of Environmental Protection, Defendants.

Carolyn MALONEY, Individually, and as a member of the New York City Counsel, and Fernando Ferrer, Individually, and as the Bronx Borough President, Petitioners,

v.

CITY OF NEW YORK, New York City Department of Environmental Protection, and Albert F. Appleton, Commissioner of the New York City Department of Environmental Protection, Respondents,

and

Chambers Services, Inc., New York Organic Fertilizer Company, the Merco Joint Venture, and Renewable Earth Products of New York City, Intervenors–Respondents and Cross–Claimants.

No. CV 89–2571 (JM).

United States District Court, E.D. New York.

Jan. 31, 1992.

Andrew J. Maloney, U.S. Atty., E.D.N.Y., Brooklyn, N.Y., Deborah B. Zwany, Asst. U.S. Atty., for plaintiffs.

Corp. Counsel of the City of New York (Lewis S. Finkelman, Barbara Yessel, of counsel), New York City, for defendants-respondents.

Gutman & Gutman (S. Mac Gutman, Halima Akhtar–Gutman, of counsel), Forest Hills, N.Y., for petitioner Maloney.

New York State Dept. of Law (Ann L. Goldweber, of counsel), New York City.

McDonough, Marcus, Cohen & Tretter (Vincent Torna, of counsel), New York City, for MERCO.

Thelen, Marrin, Johnson & Bridges (Paul A. Winick, of counsel), New York City, for Chambers Services, Inc.

Stroock & Stroock & Lavan (Alvin K. Hellerstein, of counsel), New York City, for NYOFCO.

## MEMORANDUM OF DECISION AND ORDER

MISHLER, District Judge.

Defendants–Respondents City of New York, New York City Department of Environmental Protection and Albert F. Appleton move this court for an order dismissing the petition of New York City Council Member Carolyn Maloney pursuant to Fed. R.Civ.P. 12(b) or, alternatively, for an order granting them summary judgment pursuant to Fed.R.Civ.P. 56. Intervenors–Respondents, Chambers Services, Inc. ("Chambers"), New York Organic Fertilizer Company ("NYOFCO") and the Merco Joint Venture ("Merco") join in opposition of the petition and similarly move to dismiss.[1]

## BACKGROUND

Petitioners commenced this Article 78 proceeding in state court to challenge the process used by the New York City Department of Environmental Protection ("DEP") in awarding three contracts for interim sludge management services. The petition seeks to invalidate the contracts on the ground that: (1) the City violated N.Y. General Municipal Law ("GML") § 103 by not awarding the contracts through a competitive bidding process; (2) there is no exception applicable which would permit the City to circumvent the competitive bidding requirements of § 103; and (3) even if the contracts did qualify as a "special case" exception to § 103, the City did not comply with the procedures required in awarding such a contract.

By virtue of this court's jurisdiction under the Ocean Dumping Ban Act,[2] Council Member Maloney's petition was removed to this court on November 27, 1991 pursuant to the All Writs Act. The matter was then referred to Magistrate Judge Michael L. Orenstein for a Report and Recommendation. In response to respondents' motions to dismiss and/or for summary judgment, Magistrate Judge Orenstein issued a Report on December 27, 1991 which concluded that: (1) the City was not required to use competitive bidding since it was "attempting to develop an interim integrated sludge disposal system with emphasis on beneficial end-use that would guarantee compliance with the Consent Decree", *Report* at 46–47; (2) the three contracts awarded pursuant to the Request for Proposal ("RFP") procedure qualified as "special case" exceptions to the competitive bidding requirements of GML § 103, *Report* at 44–53; and (3) the City "adequately and reasonably" followed the procedures necessary to qualify as a "special case exception" under section 312(b)(1) of the New York City Charter, *Report* at 54.

Based on these findings, Magistrate Judge Orenstein recommended that the petition be dismissed and that the Chambers, Merco and NYOFCO contracts be declared valid and binding. *Report* at 55. The petitioners were then required to file any objections they had within 10 days of receipt of the Report or risk waiving their right to appeal the court's final order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72. Accordingly, on January 6, 1992, the petitioners filed their objections with the court.

---

1. Neither the United States nor the State of New York take a position on this motion.

2. In accordance with the Ocean Dumping Ban Act, 33 U.S.C. § 1414, the United States, the State of New York, and the City of New York entered into a consent decree and enforcement agreement ("Consent Decree") which required the City to phase out and terminate ocean dumping of sewage sludge. The Consent Decree was approved by this court on August 10, 1989.

Because many of the petitioner's objections overlap each other and are not succinctly framed, we will attempt to briefly summarize them.

### Procedural Objections

Procedurally, the petitioner objects to Magistrate Judge Orenstein's refusal to: (1) conduct evidentiary hearings; (2) grant Petitioner leave to serve document demands and subpoenas; and (3) hear Petitioner's motion to compel compliance with a Freedom of Information request served on the City. *Objections* at 2–3. Petitioner claims the denial of her discovery requests, coupled with the absence of an evidentiary hearing, constitutes a denial of her right to due process of law. *Id.*

### Substantive Objections

Substantively, the petitioner objects to the following aspects of Magistrate Judge Orenstein's Report: (1) the finding that Chapter 13 of the current New York City Charter is "a mere revision, simplification, codification or restatement" of New York City Charter § 343; (2) the use of GML § 120-w to find that the holding of *Associated Builders v. City of Rochester,* 67 N.Y.2d 854, 501 N.Y.S.2d 653, 492 N.E.2d 781 (1986), was not applicable to this case; (3) the determination that a City agency may not switch to competitive bidding once it has initiated an RFP process; (4) the finding that the "special case" test applies to the entire procurement process and not just to the product procured; (5) the finding that "it was impractical for DEP to develop specifications for, and let for publicly advertised bidding, contracts incorporating the methods of sludge disposal provided by Chambers, NYOFCO and Merco";[3] and (6) the conclusion that there was insufficient evidence to support the petitioners' allegations of conflict of interest, fraud and corruption in the awarding of the contracts.

### Miscellaneous Objections

The petitioners also raise a plethora of objections relating to: (1) the fact findings in the Report; (2) the application of law to facts by Magistrate Judge Orenstein; (3) the rationale used by Magistrate Judge Orenstein in sustaining the contracts; and (4) the failure by the Magistrate Judge to decide several legal issues which Petitioner believes are relevant to the proceeding.

## DISCUSSION

### 1. Standard of Review

The court's authority to review a magistrate judge's report and recommendation is governed by Fed.R.Civ.P. 72. Under Rule 72, the court is required to conduct a *de novo* review of those portions of the magistrate's decision to which objection has been made. *See Pan American World Airways, Inc. v. International Brotherhood of Teamsters,* 894 F.2d 36 (2d Cir.1990). The *de novo* standard requires that the court reach an "independent determination" of the issues presented, without giving any deference to the magistrate judge's findings. *United States v. First City Nat. Bank,* 386 U.S. 361, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967); *Ocelot Oil Corp. v. Sparrow Indus.,* 847 F.2d 1458 (10th Cir. 1988). The court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *See* 28 U.S.C. § 636(b)(1).

### 2. Summary Judgment

Summary judgment is proper when no material questions of fact remain to be decided by the factfinder and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Bay v. Times Mirror Magazine, Inc.,* 936 F.2d 112–116 (2d Cir.1991). The nonmovant's evidence is to be believed, and all ambiguities and justifiable inferences to be drawn from the underlying facts should be resolved in favor of the nonmovant. *Anderson v. Liber-*

**3.** In the City's Response to Objections dated January 22, 1992, the City claims that Magistrate Judge Orenstein never made this particular finding. *Response* at 50.

*ty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *General Electric Co. v. New York State Department of Labor,* 936 F.2d 1448, 1452 (2d Cir.1991).

When the nonmovant bears the burden of proof on an issue, the movant can discharge the burden imposed by Rule 56 by showing that there is no proof to support the nonmovant's case. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554. If the movant sustains its initial burden, the burden shifts to the nonmovant to produce evidence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Id.,* 475 U.S. at 582, 106 S.Ct. at 1356.

The answering affidavits submitted by the petitioners are insufficient to create an issue of material fact. Instead of presenting specific facts showing that there is a real need for trial, petitioners have made blanket assertions that the City's procurement process was tainted by fraud, corruption and a conflict of interest. Such conclusory allegations are insufficient to withstand a summary judgment motion. *See National Westminster Bank USA v. Ross,* 676 F.Supp. 48, 51 (S.D.N.Y.1987).

The sole issue to be decided by the court, and one which is appropriate on a summary judgment motion, is whether the City complied with applicable law in awarding the sludge management contracts to Chambers, Merco and NYOFCO. After reviewing the pleadings, affidavits and exhibits submitted to the court, we find that the City's decision to use the RFP procedure in awarding the sludge contracts was neither illegal, arbitrary nor capricious.

Furthermore, we find the petitioner's procedural objections relating to the absence of discovery to be without merit. Although the court may permit a nonmoving party to conduct additional discovery before deciding a summary judgment mo-

tion, *see* Fed.R.Civ.P. 56(f), such a rule is not an inviolate one. The party seeking discovery must first file an affidavit explaining: (1) what facts are sought and how they are to be obtained; (2) how those facts are reasonably expected to create a genuine issue of material fact; (3) what effort the affiant has made to obtain them; and (4) why the affiant was unsuccessful in those efforts. *Hudson River Sloop Clearwater, Inc. v. Department of Navy,* 891 F.2d 414, 422 (2d Cir.1989); *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 926 (2d Cir.1985). Petitioners, here, have made no such showing.

### ORDER

Upon careful review of the record, we conclude that the findings of Magistrate Judge Orenstein are amply supported by both the evidence and applicable law. Accordingly, we adopt his recommendation to uphold as valid the contracts entered into between the City of New York and Chambers, Merco and NYOFCO. The Clerk of the Court is directed to enter judgment in favor of defendants-respondents City of New York, New York City Department of Environmental Protection and Albert F. Appleton dismissing the petition of Carolyn Maloney and Fernando Ferrer.[4]

SO ORDERED.

### REPORT

ORENSTEIN, United States Magistrate Judge.

On October 29, 1991, New York City Council Member Carolyn Maloney, individually, and in her capacity as a member of the New York City Council, filed suit against the City of New York (the "City"), the New York City Department of Environmental Protection ("DEP") and Albert F. Appleton, Commissioner of DEP ("Appleton"), in Supreme Court, New York County (29824/91 N.Y.Sup.Ct., N.Y. County) pursuant to New York C.P.L.R. Art. 78 and New York G.M.L. § 51 alleging that the City and DEP

---

**4.** In light of the dismissal, we decline to pass on the questions of laches, statute of limitations and standing that are raised as procedural defenses by the intervenor-respondents.

violated New York G.M.L. § 103 which requires that municipal contracts be competitively bid. On December 17, 1991, Fernando Ferrer, the Bronx Borough President, was permitted to intervene as a petitioner, individually, and in his capacity as the Bronx Borough President, in so far as the relief he seeks is identical to that of New York City Council Member Carolyn Maloney.

Petitioners seek to enjoin the City and DEP from "enforcing, performing and disbursing funds" upon certain land-based sludge management contracts awarded in accordance with a certain Consent Decree and Enforcement Agreement entered into by the United States Department of Justice (the "DOJ"), United States Environmental Protection Agency ("EPA"), New York State ("NYS"), the City and DEP and filed in the Eastern District of New York on August 10, 1989 before United States District Judge Jacob Mishler (the "Consent Decree").

On November 27, 1991, pursuant to the All Writs Act, (28 U.S.C. § 1651), United States District Judge Jacob Mishler removed New York City Council Member Maloney's petition to this court. On the same day, Chambers Services, Inc. ("Chambers"), the Merco Joint Venture ("Merco"), New York Organic Fertilizer Company ("NYOFCO") and Renewable Earth Products of New York City ("REPNYC") were permitted, with consent of petitioner Maloney, to intervene in the removed action. Petitioner seeks to enjoin the contracts the City awarded to Chambers, Merco and NYOFCO and to enjoin further negotiations with REPNYC. At the time of the instant motions, the City and REPNYC have not executed a contract relevant to the instant proceedings.

The City, DEP and Appleton, all represented by the New York City Corporation Counsel move to dismiss the petition, or, in the alternative, for summary judgment. Chambers opposes the petition and (1) moves to dismiss the action or, in the alternative, moves for summary judgment, (2) cross claims against the City, DEP and all other appointed City officials seeking a declaration that the contract is binding and (3) requests injunctive relief against said persons from interfering with the Chambers contract. Merco opposes the petition, and moves to dismiss the action. NYOFCO opposes the petition and cross-claims against the City for declaratory and injunctive relief. REPNYC, having been granted intervenor status, has not appeared in this action.

NYS and the DOJ, representing the United States of America and EPA, are parties to the action in accordance with their obligations under the Consent Decree and as a result of the petition's removal to federal court. Neither the DOJ nor NYS have taken a position in this lawsuit.[1] On December 13, 1991, the case was referred to the undersigned to report and recommend on all dispositive motions. *See* 28 U.S.C. § 636(b)(1)(B). Based upon the facts and circumstances described herein and the discussion of the law, I recommend that the petition be dismissed and that the applications of Chambers, Merco, NYOFCO be granted declaring their respective contracts valid and enforceable.

## INTRODUCTION

### A. *Historical Background*

New York City processes about 1.7 billion gallons of wastewater per day at 14 water pollution control plants throughout the City. These plants generate about 335,000 cubic feet (10,700 wet tons) of sludge per day. It is anticipated that production will increase to about 458,300 cubic feet (14,650 wet tons) per day by the year 2000.

Since 1938, the City has disposed of its sewage sludge in the ocean. From 1938 to 1986, this was done at a site 12 miles offshore in an area first permitted by the Army Corps of Engineers and then by

---

1. According to a joint letter memorandum dated December 16 1991, both parties maintain that their objective is to seek the City's compliance with all the provisions of the Consent Decree. They do not take any position with respect to Maloney's petition. *See* Transcript of Oral Argument at 6.

EPA. In 1984, EPA designated the Deepwater Municipal Sludge Dump Site 106 miles offshore for this purpose. In April 1986, the City began to move its disposal operation to this new site and by November 1987 ceased disposal at the 12 mile site.

After designation of the 106 mile site, EPA required all ocean dumpers to apply for permits to continue this practice. The permit requirements included an evaluation of land-based sludge management alternatives, the intent being to weigh the impact of land-based options against those of ocean disposal to justify the need for ocean disposal.

New York City's first permit application for the 106 mile site, submitted in 1986, was determined to be insufficient because it contained a land-based alternative comparison that was completed in 1980. EPA asked that the City conduct a more current evaluation. The City agreed to conduct an extensive land-based sludge management alternative evaluation provided that EPA would grant it the permit while the study was performed. It was agreed that this study would take one to two years to complete. While the protocols for this study were being discussed with EPA in early 1988, Congress began to formulate language for what was to become the Ocean Dumping Ban Act ("ODBA") of 1988, which was signed by President Reagan on November 18, 1988. *See* 33 U.S.C. §§ 1412–1416.

The ODBA required all current ocean dumpers to obtain a permit for this activity by August 14, 1989. Additionally, each municipality under such a permit had to enter into either an enforcement agreement or a compliance agreement which committed the municipality to phase out ocean disposal. If a municipality could implement a long term sludge management alternative by December 31, 1991, it could enter a compliance agreement and avoid the payment of fees for disposal between August 14, 1989 and the date it ceased ocean disposal. If a municipality had to implement an interim short term solution by December 31, 1991, while developing a long term plan that would be implemented at a later date, it had to enter into an enforcement agreement and be subject to increasing fees through 1991 and then rapid acceleration beyond 1992. The City had to opt for the latter alternative.

B. *The Consent Decree And Enforcement Agreement*

Accordingly, New York City entered into the Consent Decree on August 10, 1989.[2] The Consent Decree contains four schedules with 49 milestone dates. The first schedule sets forth milestone dates for the City to implement dewatering measures for land-based sludge management. *See* Consent Decree at IV. Under this schedule, the City is to substantially complete construction of and place into operation sludge dewatering facilities capable of processing at least 20% of all sludge produced by the City by December 31, 1991 and substantially complete construction of and place into operation all sludge dewatering facilities capable of dewatering 100% of the City's sludge by June 30, 1992.

The second schedule (*see* Consent Decree at V) pertains to the solicitation of proposals from the private sector for the implementation of sludge management options for the City's Interim Sludge Management Plan (the "Interim Plan"). This Interim Plan is needed to process the dewatered sludge. The Consent Decree recited that the City "has solicited proposals for land-based sludge management" (*see* Consent Decree at V.A.) and went on to spell out the milestones in the Request for Proposals ("RFP") procedure which petitioner and the petitioner-intervenor attacks in this proceeding:

C. The defendant shall comply with the following schedule for issuance and review of its Request for Proposals:

1. Receive initial proposals in response to issuance of Request for Proposals by July 7, 1989.

---

2. Public Notice of the proposed Consent Decree was published in the Federal Register on June 30, 1989. *See* 54 F.R. 27704.

2. Evaluate initial proposals and request final technical and cost proposals by October 4, 1989.

3. Receive final technical and cost proposals by February 24, 1990.

4. Report to the United States and the State concerning the proposals submitted and the City's preliminary recommendations by June 15, 1990.

5. Notify the public of the proposals and begin to receive public comments by July 6, 1990.

6. Conclude public review by November 15, 1990.

7. Report to the United States and State concerning the proposals submitted, the proposals recommended by the City, including sufficient measures to ensure back-up capacity, and any proposed modifications of the schedules for implementation of land based sludge management of sewage sludge by December 15, 1990.

8. If any party proposes any modification of the schedules for implementation of land-based sludge management of sewage sludge as a result of the process set forth in this paragraph V, the parties agree to discuss such proposals and conclude discussions on technology and schedules by January 15, 1991.

*See* Consent Decree at V.C.

The third schedule (*see* Consent Decree at VI) requires the City to take the following measures to implement the land-based Interim Sludge Management Plan:

1. The City shall have fully executed contracts, which shall include sufficient measures to ensure back-up capacity, necessary for the interim land-based management of the City's sewage sludge by September 15, 1991.

2. The City shall cease ocean dumping of at least 20% of all sludge disposed of by the City by weight in dry tons in each calendar month from January 1, 1992 until June 30, 1992 by December 31, 1991.

3. The City shall cease ocean dumping of all sewage sludge by June 30, 1992.

*See* Consent Decree at VI. Under the Consent Decree, failure to meet these milestones would result in substantial monetary penalties. *See* Consent Decree at IX.

C. *New York City's Three Tiered Sludge Management Program*

However, even before the City entered into the Consent Decree, the City had developed a three tiered strategy to meet the needs of implementing a land-based sludge management program. These three tiers consisted of (i) the development of a dewatering program, (ii) the development of an Interim Sludge Management Program to meet the December 31, 1991 deadline for cessation of ocean disposal and (iii) the development of a Long Term Sludge Management Program.

1. Interim Sludge Management Program

Fundamental to DEP's approach to the problem of how to manage approximately 1600 dry tons of sludge per day produced by over eight million residents and a significant number of other people who work in or visit the City was the commitment to finding methods of putting the sludge to some beneficial use. This commitment grew out of genuine concerns for the environmental impacts of disposal options such as landfilling and incineration. Furthermore, DEP recognized that sludge had some nutrient value.

DEP determined that selecting just one method and one contractor to be responsible for all sludge management could be extremely risky. Given the enormous quantity of sludge generated by the City's plants, DEP did not want to run the risk of committing to just one contractor using just one type of sludge management method.

Moreover, the Consent Decree required that the City's contracts "include sufficient measure to ensure back-up capacity, necessary for the interim land-based management of the City's sewage sludge." *See*

Consent Decree at VI.1. DEP, therefore, determined that it would search for not just one, but a number of different contractors using different technologies and sites to insure that the City could make beneficial use of its sludge to the maximum extent possible.

The Stage I RFP indicated that both beneficial and non-beneficial uses of sludge would be considered. At the onset of the contracting process DEP sought a diversity of beneficial uses. Accordingly, DEP requested proposals from contractors who could explain both how they would propose to deal with the City's sludge, what amounts they could handle, and what their qualifications and financial resources were. The judgment of a committee of professional engineers was used to evaluate competing proposals based on an extensive list of criteria. DEP settled on a two-step procedure to choose its vendors.

### a. *The Stage I RFP*

In December 1988, following the enactment of the ODBA, the City published a notice of availability of a RFP for private sector vendors to manage New York City's land-based sludge reuse/disposal program from January 1, 1992 until such time as the City could implement its Long Term Program. The notice was published in the *City Record, Amsterdam News, El Diario,* and the *Engineering News Record* and requested that any parties interested in receiving DEP's RFP so indicate by December 31, 1988. As a result of this solicitation, 150 responses were received from organizations requesting copies of the RFP.

In May, 1989 DEP released the first stage of the RFP to the 150 responders. The Stage I RFP requested that the responders submit conceptual proposals including an outline of the proposed sludge management program concept, financial information, prior related experience and an implementation plan. The implementation plan was required to address permitting and environmental issues, siting considerations, schedule constraints and perceived risks and liabilities. Each responder was to provide details of its corporate organization including annual reports or audited financial statements. The RFP described the team evaluation procedure which would be used to rate the proposals and spelled out the criteria the evaluators would use in rating proposals. While beneficial uses were preferred, both beneficial and non-beneficial methods of sludge management were to be considered.

Thirty-nine proposals were received representing several different categories of sludge processing and end use. The Technical Advisory Subcommittee ("TAS"), which was formed to assist the Contract Selection Board ("CSB") in the evaluation of responses to the RFP, rated the proposals on a predetermined standardized point system according to certain qualifications of the proposer and the proven nature of the proposed concept. As set forth in the Stage I RFP, the proposals were rated by the TAS based on the: (1) viability and technology proposed, (2) experience of proposer, (3) ability to meet environmental regulations, (4) reliance on City services and (5) understanding of the problem. *See* Stage I RFP at 7.1–5. DEP determined that all proposals would be grouped into two categories. The first was a process-related category and the second an end product use/disposal category.

### b. *The Stage II RFP*

After evaluation of the thirty-nine proposals, twenty-four were determined to be qualified to go on to Stage II. The Stage II RFP required the twenty-four proposers to include the following information:

—Detailed description of the scheme, technology, transportation and product end use or disposal to be used.

—Detailed description and demonstration of the availability of reuse and disposal sites and/or markets for the end use schemes proposed.

—Detailed description of the methods to be used to meet all required environmental regulations and obtain required permits and licenses.

—Schedule for implementation including timetable for securing sites, marketing contracts and/or disposal capacities for the term of the contract. This item should also identify and address simi-

lar schedules for subcontractors, if any.

—Detailed description of transportation, storage, processing and disposal sites.

—Operation and maintenance plan.

—Contract period.

—Warranties and guarantees.

—Organization chart.

—Qualifications and experience.

*See* Stage II RFP at 1.

DEP received eleven proposals from the group of twenty-four contractors who were sent the Stage II RFP. Several of the twenty-four decided to pool their efforts. As a result about fifteen of the original twenty-four were represented. Additionally, one proposer was added at this stage because it was able to conform to the schedule. The twelve proposals were reviewed and the proposers were invited for interviews to address additional information needs and reviewer questions. Each was required to submit a revised proposal within thirty days after its interview. Nine of the twelve submitted revised technical proposals. As set forth in the Stage II RFP, these nine proposals were then evaluated based on: (1) technical viability, (2) environmental impacts, (3) beneficial use, (4) risks, (5) qualifications, (6) completeness, (7) scheduling and (8) reliance on City services.

After evaluation of the technical proposals, the *sealed* cost proposals were opened and evaluated. Primary attention in the evaluation of the cost proposals was given to the viability and reasonableness of the provided pro-forma analysis, the firm's financing ability and requirements, the adequacy of staffing levels and the cost of services to the City.

At the completion of the proposal evaluation process, five proposers were notified that the City intended to negotiate contracts with all five and that, subject to those negotiations, the City intended to contract with all five. The proposers and their respective plans were:

| PROPOSER | PROCESS | END USE |
|---|---|---|
| Apex/Enviro–Gro (NYOFCO) | Thermal Drying (pelletization) | Marketing/Distribution |
| AWT/Chemfix (REPNYC) | Chemical Stabilization | Landfill Cover |
| WMI/Bird | Composting | Marketing/Distribution |
| Merco | None | Land Application |
| Chambers | None | Landfill Disposal |

DEP then entered into negotiations with these five proposers. The negotiations involved such issues as environmental impact, feasibility, sites, the beneficial re-use of the sludge, potential markets for the sludge, costs, guarantees of financial responsibility and the severe penalties which would result to the City if the milestones set forth in the Consent Decree were not met. "It was only after evaluating all of the proposals DEP received as a result of its two-stage RFP that DEP determined that it could formulate a plan which involved a landfill backup." Lutzic Aff. at

¶ 15. DEP's aim was to put together a plan in which sufficient excess capacity could be made available to provide 200 percent of peak sludge production needs which occur on a seasonal basis, and provide enough redundant capacity among the five proposers to provide peak coverage if up to two of the five proposers dropped out for any reason. In fact, one proposer, WMI/Bird, dropped out of the negotiations.

Numerous reporting procedures were included in the Consent Decree to keep the Court informed of the progress of the RFP

procedure. A special master was appointed to "monitor the progress of the defendant in carrying out the tasks", including the awarding of contracts pursuant to the procedure spelled out in the Consent Decree. Consent Decree at XIII. The City was required to submit reports "concerning the proposals submitted and the City's preliminary recommendations by June 15, 1990." Consent Decree at V.C.4. Thereafter, the City was required to submit reports concerning "the proposals recommended by the City, including sufficient measures to ensure back-up capacity, and any proposed modifications of the schedules for implementation of land-based sludge management of sewage sludge by December 15, 1990." Consent Decree at V.C.7. The City complied and submitted to the Court both the preliminary and final reports on the progress of the RFP procedure.

DEP convened the New York City Sludge Management Citizens Advisory Committee ("CAC"). The CAC was provided with $300,000 to retain an independent consultant of its own choosing to evaluate DEP's work. The CAC's independent consultant described the methodology used by DEP to evaluate the sludge management proposals as "generally reasonable."

## STATEMENT OF FACTS

*1988*—New York City established an Inter–Agency Work Group on Sludge. The Work Group "recommended that the city contract for interim land-based sludge management services through a multi-step competitive sealed proposal (request for proposal) process." Torna Aff. at ¶ 11.

*October—November 1988* Congress passed and President Reagan signed the ODBA which mandated that ocean dumping of sludge be ended in phases beginning on January 1, 1992.

*December 1988* DEP advertised for private sector vendors who wanted to receive DEP's RFP relating to management of New York City's land-based sludge reuse/disposal program from January 1, 1992 until such time as the City could complete its long-term sludge management program. *See* Lutzic Aff. at 10. Responses were required by December 31, 1988. One hundred fifty responses to those advertisements were received and the responder's names were placed on DEP's mailing list to receive the RFP.

*February 22, 1989* DEP submitted Stage I RFP to Mayor's Office of Contracts. *See* Lanaghan Aff., Exh. C, April 11, 1990 Memo, p. 3.

*March 16, 1989* DEP submitted to the Mayor's Office of Contracts a Contracts Processing Questionnaire which spelled out the need for and the objective of the Stage I RFP. The completed questionnaire had been approved by the Commissioner of DEP who also indicated his approval of its submission to the Office of Contracts. The completed questionnaire described the work to be performed under the proposed contracts, stated the scope and objectives of the proposed RFP, described the need for the anticipated contracts, stated the reasons why agency personnel could not implement sludge processing options, described DEP's plans for dissemination of the RFP, set forth the RFP timetable, described DEP's procedures for providing equal access by all proposers to agency information, provided details of the contractor selection criteria, set forth the names and titles of the selection committee members and provided a sample of the rating sheet to be used in evaluating proposals. *See* Lanaghan Aff., Exh. A, Office of Contracts Questionnaire, Attachment # 2A, 2B, and transmittal letter. The transmittal letter indicated that "the resulting contract will be submitted to the Board of Estimate under section 349 of the [Former] City Charter." *Id.*

DEP submitted Stage II RFP to Mayor's Office on Contracts. *See* Lanaghan Aff., Exh. C, April 11, 1990 Memo, p. 3.

*March 19, 1989* The Mayor's Office of Contracts gave its approval to DEP to release the Stage I RFP. *See* Lanaghan Aff., Exh. C, April 11, 1990 Memo, p. 3.

*May 1989—September 1989* Thirty-nine proposals were received representing several different categories of sludge processing and end use. The TAS, which was

formed to assist the CSB in the evaluation of responses to the RFP, rated the proposals on a predetermined standardized point system according to the qualifications of the proposer and the proven nature of the proposed concept.

*May 19, 1989* DEP sent out the Stage I RFP to the 150 responders. Mayor's Office of Contracts approved the Stage II RFP. *See* Lanaghan Aff., Exh. C, April 11, 1990 Memo, p. 3.

DEP sent petitioner, Maloney, and other public officials a "Responsiveness Summary" which informed her that "DEP will be conducting a two-stage RFP (Request for Proposal) process" for Disposal [of Sludge] by Private Sector Operators." Marabetti Aff., Exh. A.

*June 1, 1989* DEP held a pre-proposal conference. *See* Lanaghan Aff., Exh. C, April 11, 1990 Memo, p. 3.

*June 30, 1989* A proposed consent decree in the above-captioned federal action was published in the Federal Register.

*July 7, 1989* Chambers submitted a proposal responding to the Stage I RFP.

*August 10, 1989* The Consent Decree entered into among the DOJ, EPA, NYS, the City and DEP was filed. The Consent Decree was binding on all employees of the City. *See* Consent Decree at II.

*September 5, 1989* DEP's review of Stage I proposals was completed. *See* Lanaghan Aff., Exh. C, April 11, 1990 Memo, p. 4.

*September 21, 1989* Chambers was notified that it was qualified to proceed to Stage II of procurement process.

DEP submitted a second Contracts Processing Questionnaire relating to the Stage II RFP to the Mayor's Office of Contracts, including score sheets completed by the members of the Stage I TAS which included a description of the rating system used to rate the 39 proposals submitted in response to the Stage I RFP as well as the score sheets completed by members of the Stage I TAS in rating the 39 firms. The completed questionnaire had been approved by the Commissioner of DEP who also indicated his approval of its submission to the Office of Contracts. *See* Lanaghan Aff., Exhibit B, Office of Contracts Processing Questionnaire.

*October 4, 1989* The Mayor's Office of Contracts gave its approval to DEP to release the Stage II RFP and DEP sent out the Stage II RFP to the remaining 24 contractors.

*October 30, 1989* A Notice of Public Hearing on the Draft Generic Environmental Impact Statement for the New York City Land–Based Municipal Sewage Sludge Disposal Management Plan appeared in several New York City newspapers.

*October 1989—April 1990* Eleven proposals were submitted to DEP from this group of twenty-four. Additionally, one proposer was added at this stage because it was able to conform to the schedule. The twelve proposals were reviewed and the proposers were invited in for interviews to address additional information needs and reviewer questions. Each was required to submit a revised proposal within thirty days after its interview. Nine of the twelve submitted revised technical proposals.

*November 1989* New York City voters adopted a new City Charter.

*December 4, 1989* DEP received twelve proposals.

*January 3, 1990* TAS completed its initial review of the submitted proposals and held clarification hearings on January 8 and January 19, 1990. *See* Lanaghan Aff., Exh. C, April 11, 1990 Memo, p. 4.

*February 20, 1990* Additional information and revised technical proposals due at DEP. *See* Lanaghan Aff., Exh. C, April 11, 1990 Memo, p. 4.

*February 23, 1990* Sealed cost proposals were submitted to Bureau of Water Treatment. *See* Lanaghan Aff., Exh. C., July 17, 1991 Memo, p. 3.

*March 13, 1990 and April 9, 1990* George Lutzic, Deputy Director, Regulatory Management of DEP, requested, in writing, that DEP's General Counsel, Richard Bowers, convene the CSB to hear the recommendations of the TAS for the selection

of contractors for the Interim Sludge Management Program. The April 9, 1990 memorandum requested that the "CSB approve our evaluation process, accept our recommendation to consider five of the top six rated proposers and recommend to the Commissioner that negotiations" with the five finalists go forward.

*March 16, 1990* DEP's review of the revised technical proposals was completed. *See* Lanaghan Aff., Exh. C, April 11, 1990 Memo, p. 4.

*April 1990* Chambers began negotiating with DEP. Chambers rated fifth out of the nine firms evaluated based on their final technical and cost proposals. *See* Lanaghan Aff., Exh. C., July 17, 1991 Memo, p. 3.

*April 3, 1990* DEP sent petitioner and other public officials a copy of the draft scope of work for the Generic Environmental Impact Statement II, which advised that "the RFP process for the Intermediate Range Plan's privatized system has proceeded" and contained a table specifying and explaining the nine proposals which were being considered. Marabetti Aff., Exh. C.

*April 5, 1990* CSB convened to consider the proposals from the final nine firms. *See* Lanaghan Aff., Exh. C., July 17, 1991 Memo, p. 3.

*April 11, 1990* Richard Bowers wrote to Albert Appleton, the Commissioner of DEP, summarizing the RFP process, reporting that the CSB had met on April 5, 1990 and had unanimously voted to commence negotiations with the five finalists.

*April 12, 1990* In accordance with the recommendation of the CSB, Commissioner Appleton gave his written approval of the CSB's recommendation to Edward Wagner, Assistant Commissioner of DEP and Director of the Bureau of Wastewater Treatment, to begin negotiations with the five finalists as soon as possible.

*May 25, 1990* Deputy Commissioner Holstein invited Council Member Maloney to attend a June 4, 1990 CAC meeting.

There, George Lutzic, Deputy Director, Regulatory Management, Bureau of Wastewater treatment of DEP discussed, *inter alia,* "Vendor Selection and Negotiation Process for Intermediate Sludge Management Plan." DEP sent petitioner its written responses to certain comments submitted by members of the CAC. Those responses included the following: "Sludge management options during the Intermediate Plan are determined by proposals submitted by private firms through the RFP process." Marabetti Aff., Exh. D. Notice was sent to petitioner of meetings of the CAC. *See* Marabetti Aff. at ¶ 6.

*June 1990* DEP filed its Interim Report on the RFP procedure with the court.

*July 1990* Petitioner, Maloney, and all other City Council Members were sent a copy of the Draft Environmental Statement II for the New York City Sludge Management Program Intermediate Range Plan to review before the hearing scheduled for September 12, 1990.

*August 21, 1990* Deputy Commissioner Holstein informed petitioner that DEP had "scheduled a public hearing on the New York City Sludge Management Program on Wednesday, September 12, 1990 ... to receive the public's comments on the Draft Generic Environmental Impact Statement II, (DGEIS II) which discloses the potential environmental impacts of the Program's Intermediate Range Plan." That same letter informed petitioner, Maloney, that "[p]roposals from qualified firms have been solicited and evaluated, and negotiations are currently underway with several firms." A comprehensive description of the City's Sludge Management Program was also enclosed. Marabetti Aff. Exh. E.

*September 1, 1990* The New York City Board of Estimate ceased to exist.

*December 1990* DEP filed its Final Report on the RFP Procedure with the Court.

*December 17, 1990* DEP submitted a draft of the Recommendation for Award ("RFA") of the NYOFCO contract to the Mayor's Office of Contract. *See* PPB Rule § 5–06.[3]

---

**3.** The Court relies on the City's memorandum of law and accompanying affidavits for reference

*December 26, 1990* Deputy Commissioner Holstein sent Council Member Maloney a copy of the Intermediate Range Plan for the NYC Land–Based Sludge Management Plan. That Plan comprehensively discussed the RFP process which DEP was using with respect to its Intermediate Sludge Management Plan and the status of the process. Thereafter, petitioner received a copy of the Final Generic Environmental Impact Statement II which addressed the public's comments at the aforementioned September 12, 1990 hearing.

*December 28, 1990* The Mayor's Office of Contracts approved the preliminary NYOFCO RFA and that the NYOFCO contract would be on the agenda for a public hearing scheduled for January 10, 1991.

*January 1991* The CAC's independent consultant described the methodology used by DEP to evaluate sludge management proposals as "generally reasonable."

*January 10, 1991 and January 24, 1991* The Mayor's Office of Contracts held public hearings on the proposed contracts to enable the public to testify regarding the proposed NYOFCO contract. *See* § 326 of the City Charter and § 5–06 of the PPB Rules. The hearings were publicly advertised in the *City Record* at least 10 days prior to each hearing. *See* § 14–06 of the PPB Rules; Lanaghan Aff. at 6.

*January 15, 1991* All discussions concerning modification of the schedules set forth in the Consent Decree were concluded. *See* Consent Decree at V.C. 8. Petitioners made no objections to the schedules.

*January 25, 1991* DEP submitted a draft of the RFA of the Chambers contract to the Mayor's Office of Contracts. *See* PPB rule § 5–06.

*February 1, 1991* The City's Department of Investigation advised DEP that it had completed a review of the NYOFCO contractors and had found nothing of a derogatory nature. *See* PPB Rule § 5–03(b)(10).

*February 8, 1991* The Mayor's Office of Contracts approved the preliminary Chambers RFA and the Chambers contract would be on the agenda for a public hearing on March 14, 1991.

*February 21, 1991 and March 14, 1991* The Mayor's Office of Contracts held public hearings to enable the public to testify regarding the proposed Chambers contract. The hearings were publicly advertised in the *City Record* on February 11, 1991, at least 10 days prior to each hearing. *See* PPB Rule § 14–06. Council Member Carolyn Maloney testified at that hearing that she was

> in strong opposition to the [Chambers] contract that is now before you and to ask that it be rescinded and immediately rebid in a competitive manner. The City has chosen an inappropriate method to select this contractor. I believe that the method used, a negotiated contract derived from an RFP process, has produced a contract price per ton of sludge that is far higher than the price that could have been obtained through competitive bidding. I believe that the results from competitive bids taken in adjacent communities, such as Nassau County, Westchester County and the Passaic Regional Sludge Authority in New Jersey, are so much lower than the priceds [sic] that the City has negotiated that the contract before you should be rejected out of hand.

Lanaghan Aff., Exh. C., Chambers Hearing at 6 (March 14, 1991).

*March 4, 1991* The Mayor's Office of Labor Services approved a waiver for the NYOFCO contract of the "Pre-award Submission and Review Requirement of City Charter, Chapter 13B and Executive Order 50" concerning equal employment opportunity requirements. *See* PPB Rules § 5–03(b)(10).

*April 11 and 15, 1991* The City's Department of Investigation advised DEP that it had completed a review of the Chambers contractors and had found nothing of a derogatory nature. *See* PPB Rule § 5–03(b)(10).

to the relevant Procurement Policy Board ("PPB") Rules.

*April 16, 1991* The Law Department certified the Chambers contract as to form and certified DEP's legal authority to award the contract. *See* PPB Rule § 5–04(d).

*April 22, 1991* The Law Department certified the NYOFCO contract as to form and certified DEP's legal authority to award the contract. *See* PPB Rule § 5–04(d).

*May 1, 1991* Commissioner Appleton wrote to petitioner and informed her that he had rejected her March 14, 1991 request to rebid the Chambers contract.

*July 2, 1991* The Mayor's Office of Labor Services approved a waiver for the Chambers contract of the "Pre-award Submission and Review Requirement of City Charter, Chapter 13B and Executive Order 50" concerning equal employment opportunity requirements. *See* PPB Rule § 5–03(10).

*July 17, 1991* Iris Weinshall, DEP's Deputy Commissioner and Chief Contracting Officer submitted the RFA for Chambers and NYOFCO contract to Michael Rogers, Director of the Mayor's Office of Contracts and the City's Chief Procurement Officer. *See* PPB Rules §§ 326(k) and 531(b).

*July 18, 1991* The City's Department of Investigation advised DEP that it had completed a review of the Merco contractors and had found nothing of a derogatory nature. *See* PPB Rule § 5–03(b)(10).

*July 23, 1991* DEP submitted a draft of the RFA of the Merco contract to the Mayor's Office of Contracts. *See* PPB Rule § 5–06.

*July 24, 1991* The Mayor's Office of Contracts approved the preliminary Merco RFA and that the Merco contract would be on the agenda for a public hearing on August 8, 1991.

*August 1, 1991* The City's Chief Procurement Officer signed the Certificate of Procedural Requisites for the Chambers and NYOFCO contracts. *See* PPB Rule § 541(d)(2)(i).

*August 8, 1991* The Mayor's Office of Contracts held a public hearing to enable the public to testify regarding the proposed Merco contract. The hearings were publicly advertised in the *City Record* at least 10 days prior to each hearing. *See* PPB Rule § 14–06.

*August 20, 1991* Deputy Mayor Barbara Fife signed the Certificates of Mayoral Approval for the Chambers and NYOFCO contracts. *See* PPB Rule § 541(d)(2)(ii).

*September 4, 1991* The Mayor's Office of Labor Services approved a waiver for Merco contract of the "Pre-award Submission and Review Requirement of City Charter, Chapter 13–B and Executive Order 50" concerning equal employment opportunity requirements. *See* PPB Rule § 5–03(10).

*September 6, 1991* The Law Department certified the Merco contract as to form and certified DEP's legal authority to award the contract. *See* PPB Rule § 5–04(d).

*September 6, 1991* Iris Weinshall, DEP's Deputy Commissioner and Chief Contracting Officer submitted RFA for Merco to Michael Rogers, Director of the Mayor's Office of Contracts and the City's Chief Procurement Officer. *See* PPB Rules §§ 326(k) and 531(b).

*September 10, 1991* Comptroller Elizabeth Holtzman registered the Chambers and NYOFCO contracts. *See* PPB Rule § 5–07(h)(1)(ii).

*September 13, 1991* The City's Chief Procurement Officer signed the Certificate of Procedural Requisites for the Merco contract. *See* PPB Rule § 541(d)(2)(i).

*September 13, 1991* Deputy Mayor Barbara Fife signed the certificate of Mayoral Approval for the Merco contract. *See* PPB Rule § 541(d)(2)(ii).

*September 18, 1991* Comptroller Elizabeth Holtzman registered the Merco contract. *See* PPB Rule § 5–07(h)(1)(ii).

*October 29, 1991* Council Member Carolyn Maloney commenced an Article 78 proceeding in New York State Supreme Court claiming that the Chambers, Merco and NYOFCO contracts are void because the City did not seek "competitive sealed bids."

## DISCUSSION

Petitioners claim that they are entitled to injunctive relief because the award of the Chambers, Merco and NYOFCO contracts violated section 103 of the New York General Municipal ("G.M.L."). G.M.L. § 103 requires competitive bidding for all municipal contracts. Pursuant to section 103, "all contracts for public work involving an expenditure of more than seven thousand dollars and all purchase contracts involving an expenditure of more than five thousand dollars" must be awarded to the "lowest responsible bidder furnishing the required security after advertisement for sealed bids." G.M.L. § 103(1). It is undisputed that the Chambers, Merco and NYOFCO contracts were not awarded "after advertisement for sealed bids." G.M.L. § 103(1). Thus, the court must determine whether there is an applicable exception to section 103's requirement to competitively bid municipal contracts.

In *Pacificorp Capital, Inc. v. City of New York*, 741 F.Supp. 481, 484-9 (S.D.N.Y.1990), Judge Cedarbaum in an excellent review of the law discussed the two exceptions to G.M.L. § 103. In *Pacificorp*, she noted that to be valid, a municipal contract which had *not* gone through the competitive sealed bidding process must fall within either of two recognized exceptions to G.M.L. § 103: (1) "service" contracts or (2) "contracts let pursuant to a local law enacted prior to September 1, 1953." *See* G.M.L. § 103(1).

The judicially created "service" contract exception now exists with regard to New York City only insofar as the new New York City Charter, adopted November 7, 1989 (the "New Charter"), incorporates the "service" contract exception. *See* New Charter § 312(b)(1)(i). Under the New Charter, section 312(b)(1)(i) grants a "special case" exception to those contracts where "specifications cannot be made sufficiently definite and certain to permit selection based on price alone." New Charter § 312(b)(1)(i). A review of the major cases construing the common law "service" contract exception and a comparison of those cases to section 312(b)(1)(i) of the New Charter reveals that the "service" contract exception has been incorporated into the New Charter.

### A. *Service Contract Exception*

■ "[W]hen a municipality is purchasing services which require scientific knowledge, skill, expertise and experience, it is not required to award the contract to the lowest bidder." *Pacificorp*, 741 F.Supp. at 485. For instance, in *Burroughs Corp. v. New York State Higher Education Services Corp.*, 91 A.D.2d 1078, 458 N.Y.S.2d 702 (3rd Dept.), *appeal denied*, 58 N.Y.2d 609, 462 N.Y.S.2d 1025, 448 N.E.2d 1358 (1983), the court found that the purchase of computer hardware and software fell within the "service" contract exception to the competitive bidding requirements. As noted in *Pacificorp*, the

> facts and the RFP in *Burroughs* showed that in that case the government agency was seeking the design of a computer system to meet its future needs. 'Both the RFP[4] and the undisputed facts contained in the record establish that, rather than a group of physical articles of electronic hardware, [the governmental agency] primarily was seeking the design of a computer system which would provide prompt, efficient, cost-effective com-

---

**4.** The RFP in *Burroughs* included:

various mandatory requirements ..., including the so-called 'benchmark', which required each vendor to demonstrate that its proposed system was capable of performing a prescribed task in three-quarters of the time required by HESC's current system. The RFP further instructed that the proposals would be evaluated in five phases. The final selection (Phase 5) would be based upon a weighted statistical comparison of Phases 2, 3 and 4, which cumulatively included comparative analysis of all items in the proposal, a custom-er demonstration visit and the bench mark demonstration. The weighted system to be applied in Phase 5 was not set forth in the RFP and indeed was not formulated until after all proposals were submitted. Committees of experts were set up to formulate criteria for the Phase 5 rating system and to make the actual evaluations, and ultimately, 29 separate characteristics were employed in the evaluations.

*Burroughs,* 91 A.D.2d at 1078, 458 N.Y.S.2d at 703–04.

puter services to satisfy its growing and increasingly complex needs for the next five years. Such a design required the employment of the highest skills in the field of computer science. *Vendors were allowed considerable discretion in the RFP in proposing the hardware and software components of the system, and they were also encouraged by [agency] officials to be innovative and flexible in meeting the required specifications in their design proposals.'*

*Pacificorp*, 741 F.Supp. at 485 (*citing Burroughs*, 91 A.D.2d at 1078, 458 N.Y.S.2d at 702 [bracketed text in original] [footnote and emphasis added]). Nonetheless, Judge Cedarbaum found in *Pacificorp* that the "service" contract exception did not apply because, there,

an examination of the RFP and the other evidence shows that the City knew the specific type of computer equipment it needed to meet its needs ... had conducted its own study of its computer needs and had hired an independent consultant ... to perform a capacity study.... The proposers had little discretion under the RFP in selecting the hardware or software. The RFP did not invite innovative design proposals for a computer system. The only services which the RFP called for were installation and maintenance, services which accompany many machine purchases.

*Pacificorp*, 741 F.Supp. at 485.

In *American Totalisator Co. v. Western Regional Off–Track Betting Corp.*, 44 A.D.2d 750, 396 N.Y.S.2d 301, 302 (4th Dept.1974), the court noted

[a]n extremely high degree of technical and scientific skill and knowledge are necessary for the setting up and the operation of computer data control services for off-track betting and the providing of scientific and technical services has been uniformly held not to fall within the requirement of the competitive bidding statutes.... The computer services are not described conceptually as either the leasing or purchasing of computers but the *providing of computer services* which lends substance to the conclusion

that we are dealing with an inextricable integration of scientific and technical skills used in conjunction with electronic hardware and software.

*American Totalisator*, 44 A.D.2d at 750, 396 N.Y.S.2d at 302 [emphasis added]. In *Doyle Alarm Co. v. Reville*, 65 A.D.2d 916, 410 N.Y.S.2d 466, 467 (4th Dept.1978), the court noted

[t]he specifications called for a 'reliable security system and service to monitor foreign noises in selected buildings', alerting school personnel and police to minimize property destruction and loss.... A high degree of skill is required in placing the audio equipment to insure that sounds of intrusion are not masked or, conversely, that the equipment does not transmit normal sounds such as wind upon the windows, expanding heating pipes, etc. in such a way as to make those sounds indistinguishable from attacks upon the building.

*Doyle*, 65 A.D.2d at 916, 410 N.Y.S.2d at 467.

Based on the above analysis of *Pacificorp, Burroughs, American Totalisator* and *Doyle*, it is apparent that the "service" contract exception has now been incorporated in the New Charter as section 312(b)(1)(i) which provides that competitive bidding is not required where "specifications cannot be made sufficiently definite and certain to permit selection based on price alone."

B. *Special Case Exception Under the Old Charter*

According to Judge Cedarbaum, the "special case" exception under section 343 of the New York City Charter ("Old Charter") applies when (1) "only one manufacturer or producer can supply the product" (*Pacificorp*, 741 F.Supp. at 486 (*citing Tinston v. City of New York*, 17 A.D.2d 311, 234 N.Y.S.2d 730 [1st Dept.1962], *aff'd*, 13 N.Y.2d 850, 242 N.Y.S.2d 490, 192 N.E.2d 271 [1963] and *Matter of Wade Electrical Contracting Co. v. Davis*, No. 15576/82 [Sup.Ct.N.Y.Co. July 28, 1982])), (2) "the lowest bidder has given a prohibited gift to a public official" (*Pacificorp*, 741 F.Supp.

at 486 (*citing Kayfield Const. Corp. v. Morris*, 15 A.D.2d 373, 225 N.Y.S.2d 507 [1st Dept.1962])) and (3) time is of the essence (*Pacificorp*, 741 F.Supp. at 486 (*citing Cascione v. Morris*, 40 Misc.2d 431, 243 N.Y.S.2d 67 [Sup.Ct.Queens Co.1963])). As an example of a "special case," Judge · Cedarbaum referred to *Matter of Emigrant Industrial Savings Bank*, 75 N.Y. 388, 394 (1878) [emphasis added] where the court noted that "[a]s cases might arise where from the nature of the work, or other circumstances, it would be either impracticable or unsuitable to contract for work or supplies in that manner [i.e. via competitive bids], a discretion was lodged in the common council empowering them to direct otherwise in *special cases ...*" *Pacificorp*, 741 F.Supp. at 486 (*citing Emigrant*, 75 N.Y. at 394) [bracketed text in original] [emphasis added].

> Judge Cedarbaum astutely noted that [a]lthough neither the statute nor the decisions clearly define the special case exception, both clearly suggest that a special case is limited to circumstances in which it can be demonstrated that it *is impractical and inappropriate for price alone to be the determining factor.*

*Pacificorp*, 741 F.Supp. at 486 [emphasis added]. In a case decided two years prior to *Pacificorp*, the court in *General Electric Corp. v. Koch*, No. 11470/88 (Sup.Ct. N.Y.Co. September 14, 1988) foreshadowed Judge Cedarbaum's definition of the "special case" exception. There, the court found that the

> procurement recommendations of the Police Department experts in selecting a system which was compatible with existing components already in use in the network of essential police communications coupled with the need, as shown, to maintain security from interception by persons such as drug dealers with technological ability of their own, bears witness to a *justification for going beyond cost figures alone* which, it is claimed, was done here.

*General Electric*, No. 11470/88 at 4 [emphasis added]. Judge Cedarbaum's analy-

sis of the law on the "special case" exception is consistent with section 312(b)(1)(ii) of the New Charter which provides that competitive bidding is not mandated when "judgment is required in evaluating competing proposals, and it is in the best judgment of the city to require a balancing of price, quality, and other factors."

Having determined that the "service" contract exception is now incorporated in New Charter section 312(b)(1)(i) and that the "special case" exception of section 343 of the Old Charter is now incorporated into New Charter section 312(b)(1)(ii), the court must determine whether the New Charter is "a local law enacted prior to September 1, 1953." G.M.L. § 103(1).

### C. Does the New Charter fall within the Local Law Exception to Section 103?

■ In New York State Comptroller Opinion No. 81–109, 1981 WL 16682, the Comptroller's Office indicated that G.M.L. section 103

> "indicates a Legislative intent to preempt the field as to matters contained therein and that the pre-emption would seem to apply to county charter laws. [citation omitted] However, we do not believe that the Legislature intended to preclude a charter law adopted *after* September 1, 1953 which is essentially a mere revision, simplification, consolidation, codification or restatement of a pre-September 1, 1953 special law or local law."

Opns.St.Comp.1981 No. 81–109, 1981 WL 16682 at *1–2 [emphasis added]. Thus, this court must decide whether the applicable New Charter provisions are a "mere revision, simplification, consolidation, codification or restatement" of the relevant Old Charter provisions.

Judge Cedarbaum's comment in *Pacificorp* that a "special case" exists when it "is impractical and inappropriate for price alone to be a determining factor" (*Pacificorp*, 741 F.Supp. at 486) is extremely instructive when viewed in context of the wording of the New Charter. The New Charter provides that a "special case" exists when "competitive sealed bidding is not *practicable* or not advantageous ...

[and] it is in the best judgment of the city to require a *balancing of price, quality, and other factors."* New Charter § 312 [emphasis added]. Thus, Judge Cedarbaum's review of the caselaw and her synthesis of their holdings supports this court's finding that the "special case" exception under the New Charter is, in fact, merely a codification, restatement and revision of the meaning courts have given to section 343 of the Old Charter.

Accordingly, this court finds that the New Charter sections 312 and 313 should be deemed adopted the date the Old Charter section 343 became effective. Since section 343 of the Old Charter in the form relevant to this court's inquiry became effective at a minimum in 1938 when the Old Charter had undergone a major revision, the New Charter provisions dealing with the "special case" exceptions are deemed "adopted prior to September first, nineteen hundred fifty-three" and are simply a recodification, restatement and revision of pre-September 1, 1953 provisions. G.M.L. § 103(1).[5]

### D. *City Charter Scheme*

Having determined that the Old and New Charter falls within the local law exception to G.M.L. § 103, this court must review the City's compliance therewith. Old Charter section 343(a) provides:

[i]f the several parts of the work, labor or the supplies, materials and equipment to be done or furnished shall together

---

**5.** In *Associated Builders and Contractors, Inc. v. City of Rochester,* 67 N.Y.2d 854, 855–56, 501 N.Y.S.2d 653, 654, 492 N.E.2d 781, 782 (1986), the court held that the City of Rochester's municipal ordinance 82–450 violated G.M.L. § 103 because it established a precondition to the award of a contract to the lowest responsible bidder and was authorized after September 1, 1953 is not applicable. In *Associated,* the court found that the precondition of an apprenticeship training program in a contract was inconsistent with mandated competitive bidding and was not a "mere revision, simplification, consolidation, codification or restatement" to a pre-September 1, 1953 local law. *See* Opns.St. Comp.1981 No. 81–109, 1981 WL 16682 at *1.

Unlike in *Associated,* the New York State Legislature in G.M.L. 120–w(4)(e) has already indicated its intent to allow procurement by an RFP with regard to resource recovery technology for processing mixed solid waste. Analogously, section 312 of the New Charter is simply a restatement of the intent of the New York State Legislature as found in amended G.M.L. § 120–w(4)(e) to permit RFP procurement in sludge disposal contracts.

The court notes that prior to the amendment of N.Y. G.M.L. § 120–w(4)(e), section 120–w(4)(e) read:

[a]ny contract entered into between a municipality and a private corporation, partnership or individual pursuant to this section shall be deemed a public work contract and shall be subject to the provisions of section one hundred one and section one hundred three of this chapter and the requirements to *bid* are at all times applicable.

Opns.St.Comp.1981 No. 81–109, 1981 WL 16682 at *2 (*citing* former N.Y. G.M.L. § 120–w(4)(e) [emphasis added] ). Thereafter in 1980, section (4)(e) was amended to read, in pertinent part:

[i]t is the intent of the legislature that overall cost **should** be a major criterion in the selection of contractors for award of contracts pursuant to this section and that, wherever practical, such contracts which include construction work **should** be procured through competitive bidding procedures as prescribed by sections one hundred one and one hundred three of this chapter. It is further the intent of the legislature to acknowledge the highly complex and innovative nature of resource recovery technology for processing mixed solid waste, the relative newness of the variety of resource recovery systems now available, the desirability of a single point of responsibility for the development of facilities and the economic and technical utility of contracts for resource recovery projects which include in their scope various combinations of design, construction, operation, management and/or maintenance responsibilities over prolonged periods of time and that in some instances it **may** be beneficial to the municipality to award a contract on the basis of factors other than cost alone, including but not limited to facility design, system reliability, energy efficiency, compatibility with source separation and other recycling systems and environmental protection. Accordingly, and notwithstanding the provisions of any general, special or local law or charter, a contract entered into between a municipality and any person pursuant to this section may be awarded pursuant to public bidding in compliance with sections one hundred one and one hundred three of this chapter **or** pursuant to the following provisions for the award of a contract based on evaluation of proposals submitted in response to a request for proposals prepared by or for the municipality.

N.Y.G.M.L. § 120–w(4)(e) [bold added for stress] [underlined material cited in Opns.St. Comp.1981 No. 81–109, 1981 WL 16682 at *2].

involve the expenditure of more than five thousand dollars, or in the case of construction, repair, rehabilitation or alteration, the expenditure of more than fifteen thousand dollars, such work or labor or supplies, materials, and equipment or construction, repair, rehabilitation or alteration shall be obtained only by contract on public letting founded on sealed bids under such regulations as shall be made by the board of estimate, *except that in a special case the board of estimate by a two-thirds vote may order otherwise.*

Old Charter § 343(a) [footnote and emphasis added].

In the instant case, the unique situation arose in that the City's RFP process began while the New York City Board of Estimate existed, but the execution of the Chambers, Merco and NYOFCO contracts took place in 1991 after the Board of Estimate had been dissolved on September 1, 1990.[6] Thus, it is uncontested that the City could not have complied with section 343(a) of the Old Charter.

However, the City asserts that it did comply with the New Charter § 312, to the extent possible, as of its effective date, September 1, 1990.[7]

Section 312 of the New Charter provides:

a. 1 ... [C]ontracts shall be awarded by competitive sealed bidding under such rules as shall be made by the procurement policy board, except that in a special case as defined in subdivision b of this section, the head of an agency proposing to award such contract may order otherwise in accordance with policies and procedures established by the procurement policy board.

2. A determination by the head of an agency to use other than competitive sealed bidding ... shall be made in writing, stating the reasons why competitive sealed bidding is not practicable or not advantageous and why the method of procurement selected pursuant to section three hundred seventeen is the most competitive alternative that is appropriate under the circumstances. The head of the agency shall submit a copy of such determination to the procurement policy board and shall include the determination or a summary of the determination in the notice of solicitation, or for an emergency procurement in the notice of award, required to be published pursuant to section three hundred twenty-five of this chapter.

b. 1. For the purposes of this chapter, the term 'special case' shall be defined as a situation in which it is either not practicable or not advantageous to the city to use competitive sealed bidding for one of the following reasons:

i. specifications cannot be made sufficiently definite and certain to permit selection based on price alone;

ii. judgment is required in evaluating competing proposals, and it is in the best judgment of the city to require a balancing of price, quality, and other factors.

\* \* \* \* \* \*

New Charter § 312.

Further, if a method of procurement other than sealed competitive bidding is utilized, section 317 of the New Charter provides:

[i]f, in accordance with section three hundred twelve, an agency determines that the use of competitive sealed bidding is not practicable or not advantageous to the city, the agency shall select the most competitive alternative method of procurement provided for by sections three hundred eighteen through three hundred

---

6. "The practice routinely followed by the Board of Estimate was to review and vote on proposed contracts as the last step prior to submission of contracts to the Comptroller for registration. Under the new Charter, the certification that procedural requisites have been followed occurs at the same point in the process that the Board of Estimate approval used to typically occur." Mills Aff. at 2. *See* Minutes of the Meeting of the Subcommittee of City Contracts, New York City Council, p. 131 October 22, 1991 (Commissioner Appleton of the New York City Department of Environmental Protection testified that "no Board of Estimate approval was required for the mere solicitation [of interested vendors]").

7. The citizens of New York City adopted the New Charter on November 7, 1989.

twenty-two [competitive sealed bids from prequalified vendors; competitive sealed proposals,[8] competitive sealed proposals from prequalified vendors; sole source; alternative procurement procedures] which is appropriate under the circumstance. Each agency contract file shall contain documentation of such determination and of the basis upon which each contract is awarded, as is required by the procurement policy board.

New Charter § 317(a) [bracketed material and footnote added]. Moreover because the RFP process began while the Old Charter was in existence and continued through the time when the New Charter became effective, the court must look at the transition rules as provided in the New Charter. Specifically, section 1152(d)(1)(c) of the New Charter provides that:

contract solicitations initiated prior to the first day of September, nineteen hundred ninety which would otherwise require the approval of the board of estimate that are not submitted to the board of estimate for approval by such date shall be awarded by the agency in accordance with the provisions of chapter thirteen otherwise not to take effect until the first day of September, nineteen hundred ninety [The New Charter] and, *to the extent practicable, with the rules of the procurement policy board.*

New Charter § 1152(d)(1)(c) [bracketed material and emphasis added].[9]

1. Did the City comply with the New Charter provisions?

a. *Explicit Compliance*

i. Affirmative

The City did comply with section 319 of the New Charter regarding the proper use

of competitive sealed proposals and the awarding of contracts pursuant thereto. Section 319 provides that

[i]n accordance with section three hundred seventeen, proposals may be solicited through a request for proposals with award to the responsible offeror whose proposal is determined to the most advantageous to the city, taking into consideration the price and such other factors or criteria as are set forth in the request for proposals. No other factors or criteria shall be used in the evaluation and award of the contract except those specified in the request for proposals. Discussions may be conducted with responsible offerors who submit proposals, provided that offerors shall be accorded fair treatment with respect to any opportunity for discussion and revision of the proposals.

New Charter § 319. Compliance with section 319 is not disputed by any of the parties.

ii. Negative

It is undisputed that the City did *not* comply with section 312(a)(1) requiring that

contracts shall be awarded by competitive sealed bidding ... except that in a special case ... the head of an agency proposing to award such contract may order otherwise in accordance with policies and procedures established by the procurement policy board.

New Charter § 312(a)(1). In addition, it is undisputed that the City did not comply with section 312(a)(2) of the New Charter requiring the head of an agency to put "in writing, stating the reasons why competi-

8. The RFP process is also referred to as competitive sealed proposals. *See* Guidelines for Mayoral Agency Contracting, Pt. II, Ch. 1 p. 1 (September 1989).

9. Section 1152(d)(1)(b) of the New Charter provides:

the procurement policy board, upon its creation, shall be authorized to exercise the authority granted to it by the remaining sections of chapter thirteen otherwise *not to take effect* until the first day of September, nineteen hundred ninety [the effective date of the New Charter and this chapter], to promulgate rules

*prior* to the effective date of those sections as are necessary to implement the provisions of the chapter. Such rules required by the chapter to be promulgated shall be proposed in accordance with the requirements of subdivision b of section one thousand forty-three of this chapter by the first day of June, nineteen hundred ninety.

New Charter § 1152(d)(1)(b) [bracketed material and emphasis added]. The court takes judicial notice that prior to September 1, 1990, no such rules were promulgated.

tive bidding is not practicable or not advantageous and why the method of procurement selected [*i.e.*, competitive sealed proposals] ... is the most competitive alternative that is appropriate under the circumstances." New Charter § 312(a)(2) [bracketed material added]. Nor is it disputed that the City did not comply with section 317 requiring that "[e]ach agency contract file shall contain documentation of such ["special case"] determination and of the basis upon which each contract is awarded, as is required by the procurement policy board." New Charter § 317(a) [bracketed material added].

Nevertheless, it is also undisputed that at the time the City proceeded with the RFP process, neither the New Charter was in effect nor was the Procurement Policy Board in existence. When the RFP process began, the City was only bound by the Old Charter which did not include specific rules regarding the use of an RFP process. The Old Charter merely required Board of Estimate approval for methods of procurement other than by sealed competitive bidding. Thus, even if the City attempted to follow the New Charter's procedures beginning in November 7, 1989, the date the New Charter was adopted by the citizens of New York City, neither the Procurement Policy Board nor its rules existed. Thus, the court must examine whether under the New Charter's transition rules, section 1152(d)(1)(c), the City complied with the Old and New Charters "to the extent practicable, with the rules of the procurement policy board." New Charter § 1152(d)(1)(c).

### b. *Compliance "to the extent practicable"*

■ On March 19, 1989, the Commissioner of the DEP formally approved the submission of Stage I of the RFP to the Mayor's Office of Contracts. The transmittal form signed by the Commissioner indicated that the "resulting contract will be submit-

ted to the Board of Estimate under section 349 of the [Old] City Charter." *See* Lanaghan Aff. Exh. A. p. 1. The papers accompanying the transmittal letter also indicated that the "objective of this RFP is to identify and if possible, implement viable short-term alternatives for the removal and disposal of the City's municipal sewage sludge using contracted private services." *See* Lanaghan Aff. Exh. A. p. 2. In addition, the transmittal documents for Stage I and Stage II indicated, *inter alia*, the scope and objective of the proposed RFP, why an outside vendor was necessary, the need for the contract, the plans to disseminate the RFP and a proposed RFP timetable. *See* Lanaghan Aff. Exh. A and B.

The DEP Commissioner's failure to follow the policies and procedures established by the *non-existent* Procurement Policy Board when proposing to award a contract through an RFP is not fatal with respect to determining whether the City complied with the Old and New Charter provisions. In fact, the court finds that, under the circumstances, the Commissioner's RFP transmittal letters with attachments of March 16, 1989 (Lanaghan Aff. Exh. A) and September 21, 1989 (Lanaghan Aff. Exh. B) and the introduction to the Stage I RFP describing the procurement process to be the functional equivalent to stating

in writing ... the reasons why competitive sealed bidding is not practicable or not advantageous and why the method of procurement selected pursuant to section three hundred seventeen is the most competitive alternative that is appropriate under the circumstances.

New Charter § 312(a)(2). Based on the above, the court finds that, to the extent practicable, the City did comply with the Old and New Charter's procedural requirements as they existed during the RFP procurement process.[10] Having found that the

---

**10.** The City complied with the extant PPB rules which were appropriate for the City's approval of the contracts.

Iris Weinshall, DEP's Deputy Commissioner and Chief Contracting Officer submitted Recommendations for Award for the contracts to Michael Rogers, Director of the Mayor's Office of

Contracts and the City's Chief Procurement Officer. *See* PPB Rules §§ 326(k) and 531(b).

The Mayor's Office of Labor Services approved a waiver for the contracts of the "Pre-award Submission and Review Requirement of City Charter, Chapter 13B and Executive Order 50" concerning equal employment opportunity requirements. *See* PPB Rule § 5–03(b)(10).

City complied with the procedural requirements under the City Charter, the court must determine whether the city complied with the substantive requirements of section 312 of the New Charter in proceeding with the RFP process under the "special case" exception.

2. Could the City have switched to sealed competitive bids after beginning the process with an RFP?

■ Petitioners assert that as the RFP process progressed there came a point in time where sufficient specificity existed in the City's sludge disposal requirements that procurement through a sealed competitive bidding process could have taken place. In support of this assertion, petitioners refer to Commissioner Appleton's statement during the October 22, 1991 hearing that

[w]here are [sic] we starting now and through this experience, we would in fact do this as a bid contract. In fact, for several months we have had bid specifications ready to go for both beneficial and non-beneficial use. But the contracting process that was started in 1988–1989 was for an untested program that was a program for the disposal of all city sludge and had a number of components to it. At that point in time, the city wanted the flexibility of figuring out exactly how land disposal of sludge, which was our backup emergency and our least important component, was going to work and that's why at that time it was not appropriate to be put in a bid document.

Minutes of the Meeting of the Subcommittee of City Contracts, New York City Coun-

cil, p. 133 (October 22, 1991). Notwithstanding the fact that petitioners' theory would undermine future RFP procurement by the City since contractors could not rely on a RFP as more than a fact finding mission leading to an eventual competitive sealed bidding process, petitioners' theory would violate section 319 of the New Charter. As noted previously, section 319 of the New Charter provides:

[i]n accordance with section three hundred seventeen, proposals may be solicited through a request for proposals with award to the responsible offeror whose proposal is determined to be the most advantageous to the city, taking into consideration the price and such other factors or criteria as are set forth in the request for proposals. *No other factors or criteria shall be used in the evaluation and award of the contract except those specified in the request for proposals.* Discussions may be conducted with responsible offerors who submit proposals, provided that offerors shall be accorded fair treatment with respect to any opportunity for discussion and revision of the proposals.

New Charter § 319 [emphasis added]. Thus, upon the City's decision to proceed with an RFP, it could not then switch to a sealed competitive bid procedure once it became apparent that bid specifications could be developed. The court concludes that once price *and* other specified factors or criteria are listed in an RFP, the award must be made on the basis of those factors. A switch to a competitive bid procurement would be inconsistent with section 319. *See* New Charter § 312 [11].

---

The Mayor's Office of Contracts held public hearings to enable the public to testify regarding the proposed contracts. The hearings were publicly advertised in the *City Record* at least 10 days prior to each hearing. *See* PPB Rule § 14–06.

The City's Department of Investigation advised DEP that it had completed a review of proposed contractors and had found nothing of a derogatory nature. *See* PPB Rule § 5–03(b)(10).

The Law Department certified the contracts as to form and certified DEP's legal authority to award the contracts. *See* PPB Rule § 5–04(d).

The City's Chief Procurement Officer signed the Certificate of Procedural Requisites for the contracts. *See* PPB Rule § 541(d)(2)(i).

Deputy Mayor Barbara Fife signed the Certificates of Mayoral Approval for the contracts. *See* PPB Rule § 541(d)(2)(ii).

Comptroller Elizabeth Holtzman registered the contracts. *See* PPB Rule § 5–07(h)(1)(ii).

11. Admittedly, the City could decide not to come to terms with the Stage II RFP finalists, but assuming the City negotiated in good faith and that there was truly an urgency to this process as is evidenced by the Consent Decree, a switch to sealed competitive bidding would be a violation of the New Charter rules.

Even assuming that specifications were available by early 1991 and that switching methods of procurement was not violative of the New Charter, that does not prevent the City from, in the alternative, considering these contracts "special cases" under section 312(b)(1)(ii) where "judgment is required in evaluating competing proposals, and it is in the best judgment of the city to require a balancing of price, quality, and other factors." New Charter § 312(b)(1)(ii).

E. *Are the Contracts "Special Cases" under New Charter §§ 312(b)(1)(i) or 312(b)(1)(ii)?*

The Stage I RFP states that:

The objective of this Request for Proposal, Stage I (RFP) is to identify viable alternatives for the removal and disposal of the City's municipal sewage sludge using contracted private services.

The City desires to receive information on the plans, qualifications and capabilities of interested parties to accept at least 10 percent of the average annual production of sewage sludge for disposal using commercially available and environmentally acceptable processes. The

City will evaluate all proposals in the manner discussed in Section 7 and identify a short-list of acceptable proposers who will then be requested to submit formal, detailed technical and cost proposals under Request for Proposal Stage II.

It is the intent of the City ultimately to award several contracts for removal and disposal of sludge to enhance the overall reliability of the provided services and provide some redundancy. The City is not bound to any one disposal technology and will consider any concept that meets the basic criteria of commercial availability and environmental acceptability.

Request for Proposals for Sludge Management Services, Stage I Qualifications and Conceptual Plan, p. 10–11 (May 1989).[12] Supporting these statements was the comment by Richard Bowers, DEP's General Counsel, in his April 11, 1990 memorandum that "[i]t is our belief that is necessary to have a number of different contractors utilizing different technologies and disposal locations to insure that we have adequate capacity to dispose of our sewage sludge." *See* Lanaghan Aff., Exh. C, April 11, 1990 Memo, p. 6.

---

**12.** The court takes judicial notice that pursuant to G.M.L. § 120–w both Nassau County and Westchester County used an RFP procedure to find viable alternatives to process their sludge. Specifically,

to consider all options available to the County, a Request for Proposals (RFP) was issued to the private sector to ascertain if a private company, with the necessary resources, was interested in dewatering and disposing Nassau County sludge, on either an interim or long-term basis.... The RFP was issued in accordance with New York State General Municipal Law Section 120–w. After numerous meetings in January and February of 1989, the Counties issued a Draft RFP on March 1, 1989 for comments from prospective proposers.... The Counties findings were documented and a Final FRFP was issued on July 10, 1989. Preproposal meetings were held with prospective vendors on August 14, 1989 and August 16, 1989. A responsiveness Summary describing the proceedings of the two meetings.... Meetings were held between the Counties and their engineering consultants on October 4 and October 15, 1989 to discuss the proposals received. As a result of discussions during those meetings, the review team issued a Request for Clarifications to

each of the proposers in which the respective proposers were requested to clarify aspects of the proposals. Responses to the clarification requests were received from each of the proposers on November 15, 1989. The proposals and the clarifications received from the respective proposer *were reviewed on the basis of cost, experience of the proposer's project team, financial capability, ability to meet schedule requirements, proposed technology, and the ability to comply with legal requirements.* Based upon this review three of nine proposers were interviewed by the review team on December 18 and 19, 1989. As a result of the interview process the review team short-listed two vendors for simultaneous negotiation. The first of these vendors Apex proposed an off-site heat drying and pelletization process. The second vendor, Air and Water Technology proposed a chemical fixation process to produce a landfill cover material. Nassau County Department of Public Works: Evaluation of Long–Term Sludge Alternatives Final Generic Environmental Impact Statement; Evaluation of Interim Sludge Disposal Alternatives Final Environmental Impact Statement, Greeley and Hansen, pp. 2–3 (April 1990) [emphasis added].

Based on section 312(b)(1)(ii) which provides that when "judgment is required in evaluating competing proposals, and it is in the best judgment of the city to require a balancing of price, quality, and other factors" competitive bidding is not required. Accordingly, based on the materials filed with the court, this court concludes that the City was attempting to develop an interim integrated sludge disposal system with emphasis on beneficial end use that would guarantee compliance with the Consent Decree.

### 1. The Chambers Contract

■ Petitioners assert that the Chambers contract is no more than a large "haul and dispose" contract and that the Charles City landfill and the method Chambers proposes to haul the dewatered sludge is not unique. Specifically, petitioners assert that the City "makes no claim that the intermodal system available to Chambers is without equivalence; and Chambers does not allege that other companies would be unable to adopt and fabricate intermodal containers for long distance transportation." Maloney Memorandum of Law on behalf of Petitioner Maloney at 18, filed December 17, 1991 ("Maloney Memo"). In support of petitioners' claim that there is a lack of uniqueness in their method of transporting the sludge, Petitioner cites to Chambers' statement that

[t]his intermodal container system had never been used before for the distance transportation of sludge, but Chambers determined the system, with gasketed latching metal container tops, met the rigorous safety and technical concerns and criteria expressed by the City ... Chambers also, independently of the City, acquired an exclusive license to use the system for the hauling of waste to assure that the system would be available for use in performing the City contract, if it was awarded to Chambers.

Peterson Aff. at ¶ 13; Declaration of Halima Akhtar–Gutman at ¶ 34.

However, petitioners misses the point of the "special case" exception in section 312(b)(1)(ii) which states that where "judg-ment is required in evaluating competing proposals, and it is in the best judgment of the city to require a balancing of price, quality, and other factors." The essence of that exception goes to the overall nature of what the City is attempting to accomplish: a unified and integrated interim method of sludge disposal that required coordinated, innovative and flexible approaches to a complex problem that will continue to plague the City for many years to come. With the Chambers contract, the City was attempting to obtain a contract which would for over six years guarantee them a method of disposing of sludge in an environmentally secure landfill, while at the same time providing them with the flexibility to vary the amount of sludge deposited in the landfill in accordance with their objective of using other disposal methods with beneficial end uses.

Maloney contends that the Chambers contract is not a "special case" because the intermodal system was not patented or that it could be adopted by other companies or that others could create a similar system. If the court adopted this reasoning, "special cases" would only be found if a firm had a monopoly founded upon a trade secret. The "special case" exception is not that narrow.

An examination of the relevant documents indicate that Chambers' landfill option was at the best considered a backup, given the low capacity they were proposing in their Stage I and II proposals, and that a standby capacity was never contemplated until the very end of the negotiation process. Mr. Lutzic's statement, which was cited by petitioner, Maloney, in her memorandum, that "it was only after evaluating all of the proposals DEP received as a result of its two-stage RFP that DEP determined that it could formulate a plan with a landfill back up," supports this conclusion. Lutzic Aff. at ¶ 15; Declaration of Halima Akhtar–Gutman at ¶ 26. Moreover, as is evident in the RFP, given the City's goal of beneficial use, it is undisputed that a landfill option was the furthest from the City's mind when it began the RFP process. Thus, contrary to what petitioner claims, the Consent Decree's call for

a back-up capacity is not an indication that a landfill back up was contemplated. *See* Consent Decree VI.1.

In addition, given the differences between the landfill capacity that Chambers was proposing and what was eventually agreed upon, it is evident that competitive bidding could not fulfill the City's requirements for sludge disposal. For instance, DEP's March 8, 1990 summary of the Stage II proposals indicated that Chambers offered to dispose of 65 dry tons per day of sludge with a peak capacity of 122 dry tons per day. According to their Stage II proposal, Chambers would use the Charles City landfill and a second unnamed site to fulfill these commitments. *See* Winick Declaration, Exh. 8 (Chambers Summary at p. 1). These amounts were confirmed in Chamber's Revised Stage II proposal, dated February 12, 1990. *See* Peterson Declaration, Exh. D at p. 7.

Likewise, DEP's summary indicated that Waste Management Inc., the only other landfill proposer, offered to dispose of a similar amount of sludge: 75 dry tons per day with a peak capacity of 150 dry tons per day. Waste Management would use any of four landfills: two located in New York State and two located in Massachusetts. *See* Winick Declaration, Exh. 8 (Waste Management Summary at p. 1–2). From these facts, it becomes obvious that the City did not as of the Stage II process intend on using a landfill method as a back-up nor contemplate a standby capacity.

Petitioners also argue that the Charles City landfill is not unique and, thus, the Chambers contract can not be a "special case." Petitioners claim that the contract should be competitively bid because the Charles City landfill is not a guaranteed sludge disposal space since federal regulations might change in the future. *Ipso facto*, petitioner must thus be assuming that a competitively bid contract would provide such a guarantee. Based on the City's objectives in sludge disposal as noted in the RFP for Stage I and II, the court finds that the Chambers contract is a "special case" under section 312(b)(1)(ii) and part of the

integrated sludge disposal plan which the City has attempted to secure.

### 2. Merco Contract

■ Petitioner, Maloney, in her memorandum of law, does not offer one specific criticism of the Merco contract. In support of the petition, in the Declaration of Halima Akhtar–Gutman (¶¶ 88–90), petitioner states that the Merco contract is "unexceptional" and "that Merco and Chambers were considered as providing essentially similar services with no processing of the sludge waste."

The court disagrees with petitioner's conclusion that the Merco contract is merely a "haul and dispose" contract. The affidavit of Tonie Sharp is telling. The court recognizes that members of the Merco Joint Venture pioneered the beneficial land application of sludge to agricultural land. *See* Sharp Aff. at 3. According to Sharp,

[l]and application can be, if performed with the appropriate technological and scientific skill and coupled with proper management procedures to safeguard public health, one of the best reuse and recycle methods of sewage sludge. Sludge must be land applied by surface application at rates that are acceptable to soil and plant life and incorporated into the soil by discing. This method places the sludge beneath the soil, so that plant root growth can quickly consume the nutrients that are available in the sludge.

Sharp Aff. at ¶ 7. More specifically, the Merco contract will be the

largest land application program to-date. Far from being a simple haul and dispose operation, the City's land application Contract involves an extensive and ongoing design, monitoring and testing process, requiring the services of appropriate professional services including agronomists, chemical and mechanical engineers, environmental scientists, geologists, land use planners, and operation managers.

Sharp Aff. at ¶ 10. In addition, Merco's core staff include soil analysts, ground water and chemical analysts and bio-environmental planners. Sharp Aff. at ¶ 3. More-

over, Merco's plan with the Oklahoma Department of Health requires, *inter alia*, (1) sampling, testing and sealing of the sludge filled rail containers before leaving New York, (2) the application of the sludge to the land at proper agronomic rates and (3) the evaluation of all sites before application. Based on the above, notwithstanding the politically sensitive issue of sludge disposal in places other than New York, the court finds that the Merco contract is a "special case" under section 312(b)(1)(ii) of the New Charter. Consequently, the Merco contract is not subject to the competitive bidding requirements of G.M.L. § 103 and should be deemed a "special case."

### 3. NYOFCO Contract

■ Petitioner asserts that the NYOFCO contract is not a scientific and technical contract, but rather a "haul and dispose" contract. Petitioners state that the court must "consider the enormous value of the contract [13], i.e. in excess of four hundred and fifty million dollars, and whether any technical and scientific services provided by NYOFCO is uniquely identified with the contractor." Maloney Memo at 19. Specifically, petitioners assert that

> while the value of NYOFCO's plant management service is not identified in the contract, the enormous expense of the contract consists substantially of plant construction, other capital expenditures and transportation costs; it surely cannot be said that the plant and equipment supplied by NYOFCO are merely ancillary to any technical and scientific matters provided by NYOFCO; NYOFCO is required to create no new technology, since technology of its process has previously been fully developed, tested and patented; since the technology can be transferred to the City (at the end of their initial lease term), it is not evident that NYOFCO's technical and scientific expertise is uniquely and inseparably a part of the ongoing management of the pelletizing plant; and the very fact that either principal, without the City's con-

sent and in apparent violation of General Municipal Law Section 109–a may withdraw from the contract, demonstrates that the City is relying on the performance bond and the license transfer terms of the contract rather than upon any unique and irreplaceable expertise [sic] personal to the NYOFCO corporate principals. There is additionally, no evidence that NYOFCO holds a monopoly on the pelletization of sludge waste.

Maloney Memo at 19–20. "[T]he right of assignment coupled with the transferability of the license for the ENVIRO–GRO [pelletization] process demonstrated that no personal, professional skill unique to the partnership is required for performance of the contract." Maloney Memo at 23–24.

While the court is troubled with the alleged ability to transfer the pelletization license and the possibility that an assignment of the contract NYOFCO might be permissible, the petitioners again miss the point that section 312(b)(1)(ii) of the New Charter deals not with uniqueness, but with "a balancing of price, quality, and other factors." In this respect, the combination of "beneficial end use" and disposal capacity fit within the design of the integrated sludge disposal system which the City contemplated. Under petitioners' theory, an owner of a patent could not license it to a joint venture in fear that the contemplated contract would be considered not unique and potentially not a "special case." Moreover, as indicated above, the "special case" exceptions under the New Charter is not as narrow as petitioners claim. NYOFCO need not have a monopoly. Consequently, this court finds that the NYOFCO contract falls under the "special case" exception section 312(b)(1)(ii) and thus is not subject to the sealed competitive bidding requirements of G.M.L. § 103.

### CONCLUSION

It is not this court's function to determine whether the City negotiated well, or whether the price is too high or too low.

---

**13.** As indicated at oral argument, the value of the contract is irrelevant to the determination of whether the NYOFCO contract falls within the special case exception to section 312 of the New Charter. *See* Transcript of Oral Argument at p. 130.

The court is required, however, to scrutinize the process and consider whether the City should have proceeded pursuant to section 103 of the General Municipal Law or whether the facts and circumstances permitted proceeding under a recognized exception to the General Municipal Law and then whether the City acted in accordance with the steps required under such exception.

Under the facts and circumstances presented, this court finds that the City embarked on a search to provide a coordinated and integrated, interim environmentally sensitive method to dispose of sewage sludge which also offered a preferred beneficial end use. The City sought a design of a flexible sludge disposal system which would provide an efficient, cost-effective disposal program which would satisfy the City's growing and increasingly complex needs until a long term disposal program could be implemented. Thus, the City justifiably permitted considerable discretion in the RFP and encouraged contractors to be innovative and flexible in meeting the required specifications.

The court also finds that the City adequately and reasonably followed the provisions of law which permitted the use of the "special case" exception. Whether the City will achieve its objective by virtue of the Chambers, Merco and NYOFCO contracts remains to be seen. The Chambers, Merco and NYOFCO contracts are the fruit of the City's excruciating planning, RFP and negotiation efforts. It may well be that the pitfalls, twists and tribulations of the process described herein will serve as a guide to provide better communication between the executive and legislative branches of City government. Finally, petitioners have not put before the court any support of allusions to a conflict of interest or any evidence of fraud or corruption with respect to the award by RFP of any of the contracts.

In view of the disposition of the merits of the instant motions, it is unnecessary for this court to address respondents and respondent-intervenors defenses of standing, statute of limitations, laches and other procedural issues.

Based on the above, the court recommends that the petition be dismissed and that the Chambers, Merco and NYOFCO contracts be declared valid and binding contracts between the respondent-intervenors and the City and DEP and that the City, DEP and Appleton complied with § 103 of the General Municipal Law and section 312 of the New Charter.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court with a copy to the undersigned within 10 days of receipt of this report. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e); *Small v. Secretary of Health and Human Serv.*, 892 F.2d 15, 16 (2d Cir.1989) (per curiam).